TWO TRUNKS (UNITED STATES v.). See Cases Nos. 16,591 and 16,592.

## Case No. 14,304.

### The TYBEE.

[1 Woods, 358.] [1]

Circuit Court, E. D. Texas. May Term, 1870.

SHIPPING — CARRIERS OF GOODS — DELIVERY AT WHARF—CUSTOM.

1. A carrier's liability ceases when he has delivered the goods according to the bill of lading. In the absence of a special contract the goods are to be regarded as delivered when they are deposited upon the proper wharf at their place of destination, at a proper time, and notice given to the consignee, and he has had a reasonable time and opportunity, after notice, to remove them.

[Cited in Turnbull v. Citizens' Bank of Louisiana, 16 Fed. 147; The Boskenna Bay, 22 Fed. 665.]

[Cited in McNeal v. Braun, 53 N. J. Law, 624, 23 Atl. 687.]

2. A usage or special custom, prevailing at a particular port and brought to the knowledge of the parties, may vary this rule.

3. When it was the known usage and custom of the agents of a ship to keep goods in their possession after being landed upon the wharf, to take care of them, to protect them in case of rain, and to put them in a warehouse after delivery hours, for which they made a charge in addition to the freight; *held*, that they were bound to use ordinary diligence in taking care of the goods as long as the same remained in their possession, and the ship was liable for damages to the goods arising from the negligence of the ship's agents.

[Appeal from the district court of the United States for the Eastern district of Texas.]

F. H. Merriman and L. A. Thompson, for libellants.

W. P. Ballinger, T. M. Jack, and M. F. Mott, for claimants.

BRADLEY, Circuit Justice. On the 22d of August, 1868, a case of dry goods was shipped at New York by Cochran & Co., on board the steamer Tybee bound for the port of Galveston, consigned to the libellants at the latter place. The bill of lading states that the package was in good order and well conditioned, and then states that the same "is to be delivered in like good order and condition at the aforesaid port of Galveston, the dangers of the seas, etc., excepted, unto Burkhardt & Shaper, or to their assigns, they paying freight for the said shipment, 40 cents per foot, with 5 per cent. primage, etc." The bill of lading then contains the following agreement: "It is expressly understood, that the articles named in this bill of lading shall be at the risk of the owner, shipper or consignee thereof, as soon as delivered from the tackles of the steamer at her port of destination; and they shall be received by the consignee thereof, package by package as so delivered; and if not taken away the same day by him, they may (at the option of the steamer's agents) be sent to store, or permitted to lay where landed, at the expense and risk of the aforesaid owner, shipper or consignee." Besides this special contract, on which the respondents relied, evidence was given by them of a usage at the port of Galveston, by which, if goods were not taken from the wharf by the consignee by 4 o'clock, p. m., the ship's agents put them into a warehouse (generally belonging to third parties), and charged the goods for the trouble of such removal in addition to the freight thereon; and also, in case of rain, covered them with tarpaulin or other covering, or removed them into a warehouse or under a shed for shelter and protection. In this case the steamer arrived at Galveston on the 1st of September, and on the same day published in the newspaper notice to consignees of her arrival, and that she was discharging cargo at New wharf. The notice contained this clause, that "all goods remaining on the wharf after 4 o'clock, p. m., will be stored at the risk and expense of the consignees." It is proved that the libellants saw this notice on the day of its publication; and that they had previously received a copy of the bill of lading from New York. It further appears by the weight of the evidence, as it seems to me, that the case of goods in question was discharged from the vessel upon the wharf on the morning of the 2d of September, and whilst lying there in a pile with other goods, a severe shower of rain came up, and the goods got wet and were damaged to the amount of $180.30. The ship's people, it is true, covered the goods with sails and tarpaulins; but from the defective character of the covering used, the damage was not averted. They endeavored to obtain a lodgment for them in an adjoining warehouse, but from some misunderstanding with the superintendent did not succeed. After the shower was over, the difficulty being removed, but at what precise time does not appear, the goods were put into the warehouse. The ship's agent testified that it was not their habit to do this till after 4 o'clock. On this occasion, in consequence of the difficulty which had occurred, and the injury the goods received, he directed them to be put into the warehouse without expense to the owners. The libellants did not send for their goods till afternoon—the clerk says, between 3 and 4 o'clock. They were then shut up in the warehouse, and the delivery clerk refused to open it that day, as the different packages were all mingled together. The next day they sent for the goods and obtained them, but did not open them until the 4th, when they discovered the damage which they had sustained.

Under this state of facts the respondents claim exemption from liability for the damage complained of. The carrier's liability ceases, of course, when he has delivered the goods according to the bill of lading. The

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

general rule with regard to delivery, as laid down in the books is, that in the absence of a special contract the goods are to be regarded as delivered, so far as the carrier's responsibility is concerned, when they are deposited on the proper wharf, at their place of destination, at a proper time, and notice has been given to the consignee. A usage or special custom prevailing at a particular place, and brought to the knowledge of the parties, may vary this rule. The Richmond [Case No. 11,796], and note. Some cases qualify the rule as thus stated, by adding that the consignee must have reasonable time and opportunity to take and remove his goods before the carrier's liability is ended. Understanding this to mean, reasonable time after receiving notice of the arrival of the goods, it is undoubtedly correct. In this case there is no question about sufficient notice having been given. The consignee was aware on the first of September, that the cargo of the Tybee was discharging, or ready for discharge. He had sufficient notice to be prepared to receive the goods on the morning of the 2d, when they were discharged on the wharf, before the shower occurred. The special contract contained in the bill of lading was a valid one, subject to the qualification that notice of the steamer's arrival and readiness to discharge should be given to the consignee, which as we have seen, was given in this case. According to that contract, the goods were at the risk of the owner immediately after touching the wharf. But the usage of the port, and the actual practice of the ship's agents, may have imposed subsequent duties upon them outside of what is usually known as the carrier's liability. This, as we have seen, ceased by the contract when the goods were deposited on the wharf. By the usage and practice referred to, the ship's agents do in fact keep goods in their possession after being landed on the wharf, take care of them, put them into a warehouse after delivery hours, and protect them in case of rain; and they make a separate charge for this service in addition to the freight. They are still bailees of the goods for some purpose, and although, by the terms of the contract, they might abandon them and leave them exposed on the wharf, yet that is not the usage, nor is it the practice of the respondents. Their interest, undoubtedly, requires that they should treat their customers with some degree of attention beyond what the terms of their contract require; and, indeed, by giving up possession of the goods, they would lose their lien for freight.

What then are the duties which their continued possession of the goods, after their contract is determined, imposes? Under the usage, it cannot be said to be entirely a gratuitous bailment. My opinion is that they are analogous to those carriers who assume the duties of a warehouseman, when their duties as carriers are discharged, and that under the circumstances of the case they are bound to use ordinary diligence in taking care of the goods as long as they remain in their possession. They would not be liable for damage which might occur without their negligence, as by a fire accidently consuming them, or by any other accident against which they could not, by ordinary diligence provide. Then, did they use ordinary diligence in this case, or were they guilty of negligence? Why were not the goods placed in the warehouse on the approach of the shower? It is said that from some difficulty or misunderstanding, the warehouseman would not permit them to be put therein. But it must be remembered that the ship agent had advertised that he had a warehouse at his disposal in which the goods would be put after 4 o'clock, and it seems that this difficulty or misunderstanding was not such that it could not be remedied. Mr. McMahan, the ship's agent, on coming to the wharf, soon succeeded in removing it, and seemed to feel that some consideration was due to the owners of the goods which had been left out exposed to the shower; for, having ordered them into the warehouse, he directed that their storage should be without expense to the owners. Still, if the goods had been properly cared for on the wharf, no negligence could be attributed to the employés of the ship. But the captain admitted to one of the witnesses that he had not proper coverings to protect the goods; that the tarpaulins had been condemned, or something to that effect, and were insufficient. I think, therefore, that the agents and persons in charge of the ship are chargeable with negligence in not sufficiently providing for the safety of the goods, whilst they chose according to the local usage, their own practice, and from motives of their own, to retain them in their possession. Hence I shall affirm the decree of the district court, and direct that a decree be entered for the libellants for the sum of $180.30, with costs and the costs of the district court, against the claimants and their sureties.