RICHARDSON (UNITED STATES v.). See Cases Nos. 16,155–16,157.

RICHARDSON (WILLIAMSON v.). See Case No. 17,754.

RICHARDSON (WING v.). See Case No. 17,869.

## Case No. 11,795.

RICHARDSON et al. v. WINSOR et al.

[3 Cliff. 395.] [1]

Circuit Court, D. Massachusetts. May Term, 1871.

CHARTER PARTY — AFFREIGHTMENT — POSSESSION AND NAVIGATION OF VESSEL—DAMAGE FROM STOWAGE—STEVEDORE—CLERK.

1. Where the owner retains the possession and navigation of the vessel, and contracts to carry the cargo on freight for the voyage, the charter-party is a mere affreightment sounding in covenant, and the freighter is not invested with the legal responsibility of ownership.

[Cited in The Daniel Burns, 52 Fed. 160.]

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

2. The charter-party in such case is a contract for the conveyance of merchandise for a stipulated price.

3. Where the owner parts with the possession, command, and management of the vessel, the charterer becomes the owner for the voyage.

4. Courts of justice are not inclined to construe the contract as a demise of the ship, even though it may contain words of grant.

5. If the owners agree to keep the vessel tight, stanch, fitted, and provisioned, and to receive on board such lawful goods as the charterers or their agents might think proper to ship, they retain the command of the vessel, and the charter-party in such case is a mere contract of affreightment.

6. Then in general the owners are responsible to the charterers for failure to convey the goods according to the terms of the contract.

7. Where the contract of affreightment amounts to a demise of the ship, the officers and crew are servants of the charterer, the charterer becomes the carrier of the goods shipped, and in procuring freight, the master is then the agent of the charterer.

[Cited in Scull v. Raymond, 18 Fed. 550.]

8. In this case the owners were the carriers of the goods, and were responsible to the shippers for every loss or damage to the goods during the voyage, unless it happened by the fault of the shipper, the act of God, the public enemy, or without the fault of the carrier, or was excepted in the bill of lading.

9. In the absence of any special agreement, the duty of the master extends to all that relates to the lading and transportation of the merchandise, and in the case of a mere contract of affreightment, the ship owners and master are responsible for the faithful performance of these duties.

[Cited in Thompson v. Geo. W. Bush & Sons Co., 60 Fed. 632; Geo. W. Bush & Sons Co. v. Thompson, 13 C. C. A. 148, 65 Fed. 813.]

10. A stipulation in a charter-party that the ship is to employ charterer's stevedore and clerk, does not amount to a special agreement, to the effect that the duty of lading and stowing the goods was to be performed by the charterers.

11. This clause gave the right to the charterers to name the stevedore and clerk; but they were to be paid, and were subject to the orders of the master.

12. In this case the clerk and stevedore were nominated by the charterers; but the supervision of the lading was had by an agent of the owners; the receipting for cargo, measurement and stowage, were all under his direction. Pilotage and port charges were paid by the owners, and when loaded the charterers notified the owners they wished the vessel cleared. She was discharged at the port of destination by a stevedore employed by the master. All these facts show that the owners were responsible for the safe custody, due transport, and right delivery.

13. Whether the general owner retains the possession and command of the ship, or the control and navigation of the same passes to the charterer, the shipper under an ordinary bill of lading, may have his remedy against the ship; but whether the general owner or the charterer is liable, depends upon the terms of the charter-party.

[Cited in The Boskenna Bay, 22 Fed. 666; The International, 30 Fed. 877.]

14. The fact that the charterers have the privilege of appointing the head stevedore does not, as a matter of course, show them to be responsible for the character of the stowage.

[Appeal from the district court of the United States for the district of Massachusetts.]

Libel by the owners of the ship against the charterers to recover charter-money.

Damages were claimed by the libellants [Henry L. Richardson and others] of the respondents [Nathaniel Winsor] for a breach of the covenants and agreements contained in the charter-party annexed to the libel. They were the owners of the ship called The Commodore, and the respondents were the charterers of the ship for a voyage from Boston to San Francisco on the conditions expressed in the charter-party. By the terms of the charter-party the whole vessel, including the staterooms in the cabin, not used by the officers, and the deck-houses, not used for the crew or for the sails and stores, were placed at the sole use of the charterers or their agents, and the charterers covenanted to pay therefor the sum of $27,500, deducting the commission of two and a half per cent to be paid to the consignees of the ship. All such lawful goods as the charterers or their agents might think proper to ship were to be taken and received on board by the owners, and if required they were to sign bills of lading therefor without prejudice to the charter-party, and without regard to the charter rate of freight. Forty running lay days were allowed for loading, and the agreement was that the ship should be consigned to the charterers' agent, and that the ship-owners should pay to the con signees of the ship two and one half per cent commission for the collection of the amount of the freight-list. Goods intended for shipment were to be "received and delivered alongside, within reach of the vessel's tackles," and the seventh stipulation was "that the ship is to employ charterers' stevedore and clerk at usual rates." Two breaches of covenant were alleged in the libel as originally framed: 1. That the clerk receipted for a larger quantity of goods than were actually received and laden on the ship. 2. That some of the goods laden on board were spoiled or damaged by reason that the same were badly and improperly stowed by the charterers or their agents. Founded upon these alleged delinquencies the libellants claimed to recover damages of the respondents as the charterers of the ship, because, as they alleged, they, the libellants, had been compelled in consequence thereof to pay to the shippers of the cargo the sum of $1,300 for short deliveries of goods receipted for, as laden on board, and for goods spoiled or damaged by bad and improper stowage. Leave to file a new count to the libel was subsequently granted to the libellants, and in their new count they alleged that the ship arrived safely at her port of destination, and that all of her cargo was duly delivered in good order except what was damaged by reason of bad stowage, and that they were entitled to receive the charter-money as stipulated in the charter-party, and the complaint was that the respondents neglected and refused to perform that covenant. Testimony was taken in the district court, and, both parties having been heard, the court pronounced in favor of the libellants for such damages, if any, as were caused by the negligence of the clerk, or by bad and improper stowage at the port where the ship was loaded, and referred the cause to a master to report the amount, but the master reported that no part of the damages was caused by the fault of the clerk, or by bad and improper stowage at the port of loading, and thereupon the court accepted the report of the master, and entered a decree for the respondents dismissing the libel, and the libellants appealed to this court.

F. C. Loring, for libellants.

If the charterer chooses to employ his own stevedore and clerk, he, and not the owner, is liable for their default. Consolato del Mare, c. 192; Swainston v. Garrick, 2 Law J. Exch. (N. S.) 255; Blaikie v. Stembridge, 6 C. B. (N. S.) 894; Arnold v. Anderson, 2 Yeates, 93; The Miletus [Case No. 9,545]. Here it was agreed that the ship should "employ charterers' stevedore and clerk at usual rates." They selected the stevedore, and sent their own clerk to receive and receipt for and take account of the cargo at Boston. If the cargo was not well stored, if the clerk made a mistake in his figures, or the goods were stolen or lost after delivery to him, the ship-owner is not responsible.

George O. Shattuck, for respondents, cited Donahoe v. Kettell [Case No. 3,980]; Roberts v. Shaw, 4 Best & S. 45; Blaikie v. Stembridge, 6 C. B. (N. S.) 896; Linton v. Smith, 8 Gray, 147.

CLIFFORD, Circuit Justice. Objection is made to the jurisdiction of the district court, and as that question is in its nature preliminary, it will first be considered. Viewed solely as a claim to recover money paid for the respondents, it would certainly be difficult to sustain the jurisdiction of the district court, sitting in admiralty, as the libel in that state of the case would be simply another form for the common-law action of assumpsit for money paid, laid out, and expended. But such is not the nature of the claim made by the libellants, nor does it express the real relation which these parties sustain to each other. Both parties agree that the owners of the ship did not part with the control and management of the vessel for the voyage, and the concession is a very proper one, as it appears, by the charter-party that the general owner retained the possession and navigation of the ship, and contracted to carry the cargo on freight for the voyage; and it is well settled in such cases that the charter-party is a mere affreightment sounding in covenant, and that the freighter is not clothed with the character or legal responsibility of ownership. Donahoe v. Kettell [Case No. 3,980]; Marcardier v. Chesapeake Ins. Co.,

8 Cranch [12 U. S.] 39. Under such a charter-party the master is the agent of the owner, and the mariners are in his employment, and he is answerable for their conduct. By such a contract the charterer obtains no right of control over the vessel; but the owner, in contemplation of law and in fact, is the carrier of whatever goods are conveyed in the ship, for the reason that the charter-party is a mere covenant for the conveyance of the merchandise or the performance of the stipulated service. Parish v. Crawford, 2 Strange, 1251; Colvin v. Newberry, 1 Clark & F. 283.

Where the owner by the terms of the charter-party parts with the possession, command, and management of the vessel, the charterer becomes the owner for the voyage, and may, if he sees fit, appoint the master and ship the mariners, and of course he becomes responsible for their acts; but if the end in view can be as conveniently accomplished without giving that construction to the charter-party, courts of justice are not inclined to regard the contract as a demise of the ship, even though there may be express words of grant in the formal parts of the instrument. Christie v. Lewis, 2 Brod. & B. 410; Saville v. Campion, 2 Barn. & Ald. 510; Dean v. Hogg, 10 Bing. 345; Palmer v. Gracie [Case No. 10,692]; Hooe v. Groverman, 1 Cranch [5 U. S.] 214. Correct views are expressed upon the subject in the opinion of the district judge, but in consideration of the stipulation in the charter-party "that the ship is to employ charterers, stevedore, and clerk at usual rates," he held that the ship was not liable for bad stowage nor for the negligence of the clerk at the port where the goods were shipped. Some of the shippers claimed damages of the charterers at the port of discharge for goods not delivered, and also for injuries to their goods during the voyage. Payments were made by one party or the other, on the arrival of the vessel, to discharge such claims upon the ship, to the amount of $1300, and the libellants allege that the charterers deducted that amount from the charter-money. Evidence was introduced by the respondents tending strongly to show that the payments were made by the consignees of the ship under the direction of the master; but the district judge assumed in his opinion that the payments were made by the charterers, and inasmuch as the amended libel to which no answer was filed so alleges in substance and effect, and it nowhere appears, either in allegation or proof, that there is not that amount of the charter-money due to the libellants, the court will assume for the purpose of this investigation that the theory of fact on which the cause proceeded in the district court was correct. Church v. Shelton [Case No. 2,714]. Grave doubts, however, are entertained whether the construction of the charter-party adopted by the district court is the one most consonant with the intention of the parties to the in-strument, as collected from the language employed in view of the surrounding circumstances and the subject-matter to which the language was applied.

All agree that the owners did not demise the whole vessel, and they expressly stipulated with the charterers that the vessel should be kept tight, stanch, well fitted and provided with every requisite, and with men and provisions necessary for the voyage; and they agreed to take and receive on board the vessel during the voyage all such lawful goods and merchandise as the charterers or their agents might think proper to ship. Beyond all question, therefore, the owners retained the possession, command, and navigation of the vessel, and it is well settled that the charter-party in such a case is a mere contract of affreightment, and not a demise of the vessel, and that when the charter-party operates merely as a contract between the charterer and ship-owner for the transportation, by the latter, of merchandise to be shipped on board by the former, the owners of the vessel are the carriers of the goods, and will in general be held responsible to the charterer for the failure to convey the goods according to the terms of the contract of shipment. The Volunteer [Case No. 16,991]. Charter-parties may be, and sometimes are, so framed that the vessel herself is let to hire, as the owner parts with the possession, command, and management of the same; and in such cases the charterer becomes the owner during the term of the contract, and the services of the master and crew, unless others are appointed by the charterer, pass to the charterer as accessorial to the principal subject-matter, and in that state of the case they become for the term of the contract, if retained in service, the servants of the charterer, and as such, for the time being, are bound to obey his orders. The Volunteer [supra]; The Aberfoyle [Case No. 16]; Drinkwater v. The Spartan [Id. 4,085]; 1 Conk. Adm. 178; Newberry v. Colvin, 7 Bing. 190; 1 Pars. Shipp. 279.

Commercial usage has sanctioned these two kinds of contracts between ship-owners and charterers, and the rights, duties, obligations, and liabilities of the respective parties are as diverse and different from each other as the covenants of an ordinary lease of a railroad or other means of conveyance are from a contract for the transportation of goods for hire from one place to another. Where the charter-party of affreightment operates as a demise or bailment of the ship to the charterer he becomes the carrier of the goods shipped on board, and in case the vessel is employed by him as a general ship for the conveyance of merchandise, the master in that state of the case, is the servant of the charterer while procuring freight and contracting with third parties, and not the agent of the owners. Nothing of that kind is pretended in this case, and it is clear, therefore, that the owners of the vessel were the carriers of the goods, and as such were responsible to the charterers for

every loss or damage during the voyage, however occasioned, unless it happened by the fault of the shipper, or by the act of God, or the public enemy, or by some other cause or accident without any fault or negligence on the part of the carrier, and expressly excepted on the bill of lading. The Niagara, 21 How. [62 U. S.] 23. Such instruments sometimes contain special stipulations, and they frequently have ambiguous clauses, and on that account the universal rule is that they shall receive a liberal construction agreeable to the real intention of the parties, and conformable to the usages of trade in general and of the particular trade to which the contract relates. Raymond v. Tyson, 17 How. [58 U. S.] 59; Abb. Shipp. (5th Am. Ed.) 350; 3 Kent, Comm. (11th Ed.) 202.

Carriers by water must provide a seaworthy vessel, tight, stanch, and well furnished with suitable tackle, sails, or other motive power, as the case may be, and with furniture necessary for the voyage. She must also be provided with a crew adequate in number, and competent for the voyage, and with a competent and skilful master of sound judgment and discretion, and the owners must see to it that he is qualified for his situation, as they are responsible for his acts and negligence. He must take care to stow and arrange the cargo so that the different goods may not be injured by each other or by the motion of the vessel, or by leakage, unless by agreement this duty is to be performed by persons employed by the shipper. In the absence of any special agreement the duty of the master extends to all that relates to the lading as well as the transportation of the goods, and for the faithful performance of these duties the ship is liable as well as the master and owners. The Niagara, 21 How. [62 U. S.] 23. None of these principles are controverted, but the argument is that the special stipulation in the charter-party, that the ship is to employ charterer's stevedore and clerk at usual rates, amounts to a special agreement that the duty of lading and stowing the goods should be performed by the charterers. Doubtless it was the right of the charterers under that provision, if they saw fit to exercise it, to nominate the clerk and stevedore, but they were to be employed and paid by the owners or master of the ship, and were as much subject to the orders and direction of the master as if the charter-party had contained no such stipulation. Anglo-African Co. v. Lamzed, L. R. 1 C. P. 229. Merchandise intended as cargo was to be sent alongside of the vessel, within reach of her tackles, and the owners stipulated to take and receive on board all such lawful goods as the charterers or their agents might think proper to ship. Cargoes are usually received on board by the master or the mate in behalf of the master, and it is his duty, as defined by the rules of the maritime law, to stow and arrange the cargo or different shipments as they are received, so that the different goods may not be injured

by each other or by the motion of the vessel or by leakage. Stevedores, being mere employees for a special purpose, are subject to the directions of the officer on board in command of the vessel, and it is impossible, as it seems to the court, to select any clause in this instrument which repeals or overrules those well-settled rules of maritime law. Goods to be shipped were to be furnished by the charterers, and the goods were to be delivered for that purpose alongside within reach of the vessel's tackles. Such were the stipulations of the charterers, but it was the ship-owners who were to take and receive the goods on board of the vessel, and they, as carriers, assumed all the obligations of safe custody, due transport, and right delivery at the port of destination. Pursuant to the authority reserved in the charter-party, the charterers nominated the clerk and stevedore at the port of loading, and they were employed and paid by the owners. During the lading the master for the voyage was not on board, but all the duties of master were performed by a former master of the vessel, and part-owner, who was on board throughout that period, acting as master, and gave directions as such, and as such exercised control. Receipts for the cargo, as it was received, were given by the clerk, and he measured it as it was shipped, and it was stowed by the stevedore, subject to the directions of the person acting as master. Pilotage and port charges were paid by the owners, and when the ship was loaded the charterers notified the owners that they wished her cleared. She arrived safely at her port of destination, and was there discharged by a stevedore employed by the master and paid by the consignees for the owners out of the freight. none having been nominated by the charterers. Whether they had or had not a right to do so, it is not important to determine in this investigation, as they did not exercise that right, even if it was reserved by the charter-party.

Disputes are apt to arise between the charterers and the owners as to what constitutes a full cargo for the vessel in cases where the charter is for a stipulated sum, as it is for the interest of the owner to load lightly, and it is obviously for the interest of the charterers that the vessel should take a full load. Much depends, as to the bulk which the vessel will contain, upon the skill, care, and fidelity of the stevedore, as he cannot at every moment be under the direction of the master, and for that reason, as well as others which might be mentioned, the charterer, in case the general owner retains the possession, command, and navigation of the ship, seeks to control the selection of that employee as the means of enhancing the value of his charter-party. Where the charterer becomes the owner of the vessel for the voyage, such a stipulation is unnecessary, as he possesses that right by the general rules of the maritime law, as he is responsible as carrier for the safe custody, due transport, and right delivery of the

cargo. Instruments of the kind may contain a stipulation that the charterer or shipper shall stow the goods, and in the former case the liability as between the ship-owner and the charterer would be upon the former, and in the latter neither would be liable, as the shipper could not claim damages for his own default. Grant all that, still it cannot be admitted that the mere stipulation that the ship shall employ charterer's stevedore without more can have any such effect, as the duty of stowing the goods is still devolved on the master as the agent of the owner, and the stevedore, though nominated by the charterer, is under the control, and subject to the directions of the master or of the owner if he sees fit to perform that service. Authorities, however, are referred to which, it is insisted, establish a different rule, and it remains to give them a brief examination. Blaikie v. Stembridge, 6 C. B. (N. S.) 899, 911; Sack v. Ford, 13 C. B. (N. S.) 99; Anglo-African Co. v. Lamzed, L. R. 1 C. P. 229; Sandeman v. Scurr, L. R. 2 Q. B. 94.

Proper attention to the facts of the first case cited will enable any one to see that it does not control the case before the court, although the charter-party contained the stipulation that the "stevedore for outward cargo to be appointed by charterer, but to be paid by, and act under captain's orders." Standing alone, and without any reference to the facts of the case, that stipulation would seem to be somewhat analogous to the one under consideration, but the charter-party also contained a stipulation as follows: "Cargoes to be brought to, and taken from alongside at merchant's risk and expense, which the said charterer binds himself to ship," etc. Plaintiffs' agent arranged with the broker of the charterer for the freight and carriage of certain sugar-pans, and sent them alongside without the knowledge of the master and when he was not on board, and before the crew were shipped. Having procured the charter-party, the charterers put up the ship as a general ship, and appointed a stevedore for the outward voyage, and the stevedore and his men went on board for the purpose of stowing the cargo. No contract was made with the master in respect to the goods, and it substantially appears that he did not know that the sugar-pans were to be shipped. They were sent alongside by the shippers, and while the stevedore and his men were hoisting them on board, two of them were by their negligence damaged, and the shippers sued the master for a breach of the contract of affreightment. Judgment in the common pleas was rendered for the defendant upon the ground that no contract had been made with the master, and that no wrong had been done by the master and crew. Appeal was taken to the exchequer chamber, where the judgment was affirmed upon the same ground, the chief baron remarking that the master is not liable except in the case of a contract with him or some act done by him or the crew for which he is responsible, adding that there was not in that case any contract made by the master, nor any act done by him or the crew which led to the damage.

No extended remarks in regard to the second case referred to are necessary, as the court held that there was nothing in the charter-party to exonerate the owner from responsibility for negligent and improper stowage by the stevedores employed by the charterer under the special stipulation in the charter-party. Where the stipulation in the charter-party was that "the charterer's stevedore was to be employed by the ship," and the charterer neglected to make any appointment, the common pleas held, in the third case cited, that proof of such failure was no answer to an action against the ship-owners for not loading a full cargo, the chief justice remarking that what the defence assumed was a fallacy; that the stipulation did not require the charterers as a condition precedent to appoint a stevedore; that it was introduced for the purpose of giving them an option; that if they chose to exercise the option, it would be the master's duty to employ and pay the stevedore so appointed; that if they did not, the master was still bound to take on board as much cargo as the ship could reasonably carry.

No support to the views of the libellants in this case can be found in the remaining case cited in their favor, as the court say in that case that they attach no weight to the fact that the stevedores by whom the cargo was loaded were appointed by the charterer's agents, and they held that as the charter did not amount to a demise of the ship, and the owners remained in possession of the same, the shipper was entitled to look to the owners as responsible for the safe carriage of the goods, inasmuch as they had delivered the merchandise to be carried in the ship in ignorance that she was chartered, and had dealt with the master as clothed with the ordinary authority of a master appointed by the owners. Whether the general owner retains the possession and command of the ship, or the control and navigation of the same passes to the charterer, the shipper under an ordinary bill of lading may have his remedy against the ship, but whether the general owner or the charterer is liable depends upon the terms of the charter-party. Where it operates as a demise of the ship itself the charterer becomes liable as the owner for the voyage; but if it is simply a contract of affreightment, as in this case, the general owner is liable for every damage chargeable to a carrier, unless by special contract the shipper of the cargo was to load and stow the goods. Sandeman v. Scurr, L. R. 2 Q. B. 96. Such liability is an incident of ownership, and is chargeable to the general owner unless it appears by express stipulations that the obligation has been assumed by the charterer as special owner for the voyage. Colvin v. Newberry, 6 Bligh. [N. S.] 187. Reference is also made by the libellants

to the case of The Miletus [Case No. 9,545], but as the reporter does not give either the stipulation of the charter-party or the facts and circumstances attending the loading and stowing of the cargo, it is not possible to regard it as controlling the question before the court. Authority to appoint a head stevedore was granted to the charterer in another case not referred to by either party. The Helene, Brown. & L. 415. Comment upon that case is unnecessary, as the charter-party provided that the cargo should be received and stowed by the master, "the charterers being allowed to appoint a head stevedore at the expense and under the inspection and responsibility of the master for proper stowage." It was suggested, at the argument of the case, that the master could not be liable for bad stowage, as the charterers appointed a head stevedore; but the court held that the stowage was under the inspection and responsibility of the master by the terms of the contract. Stowage in the case before the court was made under the inspection of the acting master and part-owner of the ship, without the knowledge of the charterers or the slightest control or interference on their part, and the court is of the opinion that the owners assumed every responsibility which belongs to a carrier by water for hire.

Suppose, however, that the rule is otherwise, and that the owners of the ship were not responsible for the acts of the clerk and stevedore at the port where the goods were shipped, still the court is of the opinion that the respondents must prevail, as the libellants fail to show that any of the damages sustained by the shippers were occasioned by any act of the clerk or by bad stowage. They do not pretend that the charterers were responsible for the safe custody, due transport, or right delivery of the goods, except so far as the acts of the clerk and stevedore form a part of that obligation. Undoubtedly some of the goods were injured or lost, and the district court at the hearing on the merits assumed that the injuries or losses, or some part of them, were occasioned by the acts of the clerk and stevedore at the port of loading. His conclusion was, therefore, that the libellants were entitled to a decree, as he held that the charterers were responsible for all such damages, and, consequently, that they were liable to that extent for the unpaid balance of the charter-money. Governed by those views he entered a decree for the libellants, and sent the cause to an assessor to report the amount; but the assessor reported that no part of the damage is proved to have been caused by bad stowage, or by the fault of the clerk at the port of loading. Before the cause was sent to an assessor, the district court decided that the ship-owners were liable for all the sums paid to the shippers except for the amount, if any, paid for bad stowage and the fault of the clerk. Objections were made by the libellants to the report of the assessor, but the court after hearing the parties accepted the report and dismissed the libel. No exceptions were taken to the report of the assessor, and the evidence exhibited in the record shows beyond a doubt that the conclusion of the assessor was correct. Comment upon the occurrences at the port of discharge is quite unnecessary, as the agreed statement shows that the ship was discharged by a stevedore employed by the master without any reference to the charterers. Regarded, therefore, in either light, the libel is not sustained by the libellants, and the decree of the district court must be affirmed with costs.