## THE BOSKENNA BAY, etc.

*(District Court, S. D. New York.   December 12, 1884.)*

**1. SHIPPING—DELIVERY OF PERISHABLE CARGO—NOTICE—USAGE.**
   A vessel is bound to give reasonable notice to the consignee of readiness to discharge perishable cargo, and sufficient opportunity to receive and remove the same without injury from the weather; and she is bound by all reasonable customs of the port designed to secure that end.

**2. SAME—READINESS TO DISCHARGE.**
   A vessel is not "ready to discharge" perishable cargo, within the meaning of that phrase in the bill of lading and under the usages of the port, when the weather is so cold that fruit cannot be discharged without injury.

**3. SAME—CUSTOM—FRUIT—FROST.**
   Where a custom was proved to discharge fruit cargo in the forenoon of the day of sale previously advertised, and for the vessel to wait until the weather was mild enough to admit a discharge without injury from frost during the day, the sale being postponed accordingly, and the vessel having a large cargo which could not all be removed in one forenoon, commenced discharging about noon the day before the sale, and continued discharging till night, without notice to the consignee of intended discharge, and the fruit was injured by frost during the night, *held*, that the vessel was liable for the injury, because the discharge was not warranted at the time by any certainty as to the weather, and because it was without notice to the consignee, and a departure from the usual custom. Advertisement alone is not legal notice.

**4. SAME—STEVEDORES—SERVANTS OF SHIP—NEGLIGENCE.**
   A charter of affreightment provided that the "stevedore was to be named by the charterer and consignees, and to be employed under the captain's supervision." *Held*, that the stevedore who discharged the ship upon appointment of the charterer's agents was the servant of the ship, and that the ship was liable for his negligence in discharging the goods at an improper time.

**5. SAME—EVIDENCE—COMMERCIAL DOCUMENTS.**
   Courts of admiralty, where justice requires it, may take notice of matters not strictly proved according to the rule of the common-law courts, and where points arise incidentally and unexpectedly upon the trial, the evidence of which is found in commercial documents executed abroad, such documents may be considered without strict proof when the *res gestæ* afford the highest practical guaranties for their authenticity and correctness. But this practice should not be extended so as to justify any laches in obtaining full proof, the necessity of which could have been reasonably foreseen.

In Admiralty.
*F. Bartlett,* for libelant.
*Wheeler & Souther,* for claimant.

BROWN, J.   The libel in this case was filed to recover $1,688 damages to 2,288 boxes of oranges and lemons, through their alleged improper discharge from the steam-ship Boskenna Bay, on the twenty-first of March, 1883, in frosty weather.

1. The fruit in question was part of a cargo of about 22,000 boxes of oranges, lemons, etc., brought by the Boskenna Bay to New York from the Mediterranean.   She arrived in this city about the eighteenth of March, 1883.   On Monday, the 19th, she obtained a berth at pier 44, North river.   Oranges and lemons are perishable cargo. Lemons will not bear, without injury, exposure to a temperature below freezing; oranges, not more than two or three degrees below that. The established usage requires a vessel arriving in cold weather to wait for weather mild enough to admit of a discharge and removal of the fruit from the wharf without injury from frost.   The usual practice is to leave this matter largely to the head stevedore, who has the care of discharging the cargo.   He usually obtains information from the weather bureau as to the probabilities of the weather for the next 24 hours, and acts partly upon the information thus obtained.   The great bulk of oranges and lemons imported here is sold to jobbers at public auction.   The business is managed by a single firm of auctioneers, whose sales are at their down-town office at 12 o'clock noon. The practice is for the fruit, or so much of it as will be sufficient samples, to be put upon the wharf in the forenoon.   Buyers examine it there during the forenoon preceding the sale at auction, and buy at their own risk.   Each purchaser thereafter removes what he has purchased from the wharf on the same day.   By this means the discharge and removal of such fruit are ordinarily accomplished without injury in weather that is mild enough in the day-time, but which would be destructive to the fruit if it were allowed to remain upon the wharf over night.   On Monday and Tuesday, the nineteenth and twentieth of March, the weather was too cold to admit of discharging; and, though the vessel was otherwise ready, the unloading was accordingly deferred.   The stevedore in charge testified that on Tuesday afternoon the information received by messenger from the weather bureau at the Equitable building was favorable, and he accordingly directed the discharge to commence the next morning.   On Wednesday, the 21st, the discharge was begun some time before 11 o'clock, and continued until 5.   Pier 44 was covered by a shed closed upon the southern side, but with doors upon the northern side, through which the fruit was put upon the pier beneath the shed.   The sale of the cargo at auction was publicly advertised for the 22d, at 12 o'clock. On the morning and during the forenoon of that day the libelant and other persons went to the pier to examine the fruit discharged, when the boxes in question were found injured by frost.   One of the reasons assigned for unloading the fruit the day before the sale, was that the cargo was so large that it could not possibly be all discharged during the forenoon of the day of the sale.   The evidence is conflict-

ing upon the question whether any boxes were discharged from the ship on Thursday forenoon. There is no doubt, however, that all the libelant's boxes were discharged on Wednesday, and remained on the pier during the night. The stevedore testified that it came on cold during Wednesday night, and was cold in the forenoon of Thursday, and that none was discharged at that time.

The testimony shows that on Wednesday, the 21st, the temperature was as follows: At 7 A. M., 22 deg.; at 11, 30 deg.; at 3 P. M., 38 deg.; at 7, 29 deg.; at 11 P. M., 24 deg.; on Thursday, the 22d, at 7 A. M., 19 deg.; at 11, 33.5 deg.; at 3 P. M., 33 deg.; evening, lowest, 18 deg. From this proof of the temperature it is obvious that the weather was not fit for the discharge of fruit before 11 A. M. of the 21st. The report received from the weather bureau was not introduced in evidence; the messenger who brought it was not identified, nor the terms of his report; the stevedore could only testify that it was favorable, promising milder weather. The report, however, only professes to be that of Tuesday afternoon, nearly 24 hours before the weather was suitable to commence discharge on the following day. No inquiry appears to have been made during the cool weather of Wednesday forenoon as to the further probabilities. The published reports on the morning of that day refer to the probable temperature as "stationary or rising." The claimants offered no evidence of the official announcement of the probable weather for the next 24 hours; and in the absence of any such testimony, and of proof of the specific report made in answer to the stevedore's inquiries, they are entitled to no inferences more favorable than those warranted by the published reports, or by the actual state of the weather in the forenoon of the 21st. These evidently furnished no warrant for a discharge of the fruit on that day; for not only was there no provision for its removal from the wharf before the frosty weather that was to be expected during the night, but it was in fact contemplated that the fruit should remain there overnight. No notice was given to the libelants that the fruit was to be discharged on that day; they had no knowledge or notice that it was designed to discharge it then, or that it was discharged, until the following morning, after it had been injured. Under the usage proved, and in the ordinary course of business, the libelants had no reason to suppose that the fruit would be discharged until the morning of Thursday, the 22d, for which day the sale was advertised; and having received no express notice of its discharge on Wednesday, they are not chargeable with any laches, therefore, for not removing it on Wednesday. The case of *Liverpool, etc.*, v. *Suitter*, 17 FED. REP. 695, is therefore inapplicable. The notice of discharge published in the *Journal of Commerce* on March 21st was not seen by the libelants, and was not legal notice to them.

2. The bill of lading provides that "simultaneously with the ship's being ready to unload, * * * the consignee is hereby bound to be ready to receive the same from the ship's side." The respondents

claim that this clause exempts them from liability. The effect of a similar clause is considered and commented on by BENEDICT, J., in the case of *The Aline*, 19 FED. REP. 875. He there says, (p. 876:)

"This provision cannot relieve the steamer, for she was not 'ready to discharge,' within the meaning of this provision, when it was impossible for her to discharge without destroying the cargo. Ready to discharge means ready to make a proper discharge. And a discharge of oranges when the weather is so cold as to freeze them before they can be removed from the wharf is not a proper discharge."

The construction of such stipulations must be reasonable, and according to the presumed intention of the parties. It is not to be imagined that such a clause could authorize a ship reaching her berth at night to discharge her cargo at once on the wharf, in rain, snow, or frost, without notice to the consignee, or opportunity to him to save the cargo from destruction; and if the stipulation does not authorize this, then it is, by implication of law, subject to the condition that reasonable notice of intended discharge be given, or that any existing usage serving in lieu of such a notice must be observed by the ship; and any stipulation to the contrary of this would, I think, be void as against public policy, upon the same grounds as stipulations against negligence. *Railroad Co.* v. *Lockwood*, 17 Wall. 357. In the case of *The Kate*, 12 FED. REP. 881, BUTLER, J., says, in reference to a bill of lading having a clause substantially the same as this: "On the ship's arrival, it was the master's duty to give reasonable notice of the time and place of discharge. Whether he performed that duty is the only question involved." See *The Tybee*, 1 Woods, 358; *The Mary Washington*, Chase, Dec. 125; *The Grafton*, Ole. 43; *The E. H. Fittler*, 1 Low. 114; *The Tangier*, 1 Cliff. 396; *Caruana* v. *Packet Co.* 6 Ben. 517; *The Hindoo*, 1 FED. REP. 627.

It is clear, moreover, from the actual conduct of the parties, and from the construction practically given by them to this clause, that it was not designed to supersede the established custom of the port, so far as that custom is designed merely to prevent the destruction of the cargo in discharging; nor to change the obligation of the vessel not to discharge the fruit, either in improper weather, or without sufficient opportunity to the libelant to remove it before the freezing weather at night may come on. Though the ship was otherwise ready to discharge two days before, she deferred the discharge on account of the cold weather, because the usage and the necessity of giving suitable opportunity to remove the cargo without its being frozen required her to do so. Under this usage the vessel was not legally ready to discharge the fruit until there was weather that would permit its discharge without injuring it. The usage to discharge in the forenoon of the day of sale might possibly dispense with the need of actual notice to the consignee, if he had notice of the advertised sale, and if that day were in fact suitable for discharge, because a discharge in the forenoon would allow time enough to remove it. But this sale

was not advertised for the 21st, nor was the discharge made only in the forenoon of that day. It is clear that the discharge was made chiefly in the afternoon of the 21st, and in the expectation that the night would not injure the fruit; but as the ship neither observed the custom, nor gave the consignee any notice of the discharge different from the custom, the effect of the night's weather was at her risk. If there had been any necessity, from the amount of the cargo, to commence the discharge, contrary to the usual practice, on the day before the sale, so that the fruit would be subject to the danger of frost from remaining on the wharf overnight, the ship was bound to give timely notice of her intended departure from the usual course; and without such notice she was not legally "ready to discharge," because she had not performed her preliminary obligations.

3. The respondents further contend that they are not liable, because any negligence as to the time of discharge was negligence of the stevedore. The ship was sailing under charter, and the charter-party provided that the "stevedore was to be named by the charterer and consignees, and to be employed under the captain's supervision at usual rates." The effect of this clause, it is claimed, is to make the stevedore the agent of the charterer, and not the agent of the ship or her owners. On that ground it is claimed the latter are not liable. The cases of *The Miletus*, 5 Blatchf. 335, and *Blaikie* v. *Stembridge*, 6 C. B. (N. S.) 894, are referred to. In the case of *The Miletus*, the terms of the charter are not stated, and the record on file does not disclose them. Later cases, in which a clause of similar purport with the present has been carefully considered, leave no doubt that the ship, as carrier, remains liable for the proper delivery of the goods to the consignee under her obligations to him created by the bill of lading, unless the owner of the goods has undertaken the work of discharge. *Richardson.* v. *Winsor*, 3 Cliff. 395, 404, 407; *Sandeman* v. *Scurp*, L. R. 2 Q. B. 96; *Sack* v. *Ford*, 13 C. B. (N. S.) 90; *The T. A. Goddard*, 12 FED. REP. 174, 184. In *Richardson* v. *Winsor, supra,* CLIFFORD, J., says, (p. 406:)

"Whether the general owner retains the possession and command of the ship, or the control and navigation of the same passes to the charterer, the shipper, under an ordinary bill of lading, may have his remedy against the ship; but whether the general owner or the charterer is liable depends upon the terms of the charter-party. Where it operates as a demise of the ship itself, the charterer becomes liable as the owner for the voyage; but if it is simply a contract of affreightment, [as in this case,] the general owner is liable for every damage chargeable to a carrier, unless by special contract the shipper of the cargo was to load and stow the goods." *Sandeman* v. *Scurp,* L. R. 2 Q. B. 96.

In the present case there is no evidence that the shipper of these goods had any knowledge that the ship was under charter, and he has, therefore, a right to hold the ship for the performance of her obligations under the bill of lading, irrespective of the charter of affreightment, of which the shipper had no knowledge. The defendants fur-

ther put in evidence a notice from the agents of the charterers to the agents of the ship that the ship would commence discharging on the 21st "if weather prove favorable." As I find that the weather was neither favorable nor suitable for a discharge of the cargo to remain overnight without notice to the consignee, no notice to the latter being given, the mere notice by the charterer to the ship's agents constitutes no defense.

I have considered the last two points of defense, notwithstanding the fact that the respondent has pleaded nothing in his answer that would fairly admit these defenses, having made no reference to any charter, or to the unloading under a stevedore designated by the charterer's agents. Such defenses, to be availed of, should have been pleaded. No objection, however, was taken on the trial, on this ground. The charter was offered in evidence, as it was then understood by the court, for the purpose only of showing who were the charterers, in order that the authority of the latter's agents to give the notice of unloading might thereby appear. It had already appeared that the stevedore was employed by these agents. The charter-party was received in evidence for this incidental purpose, without formal proof of the signatures to it, but upon the testimony of the agent of the ship that the captain handed him this document, stating that it was his copy of the charter-party, together with all the other papers and documents of the ship; and that upon all these documents the business of the ship after her arrival had been conducted and settled. The charter-party bore several indorsements relating to the business of the ship upon this voyage, purporting to have been made at Triest, Syracuse, Catania, and at Palermo. The charter-party clearly could not have been read in evidence without more formal proof, in an action at common law. *Brown* v. *Thornton*, 6 Adol. & El. 185. That is not, however, a conclusive test of its competency in a court of admiralty. In the case of *The J. F. Spencer*, 3 Ben. 339, it is said, by BENEDICT, J., that "courts of admiralty are not bound by all the rules of evidence which are followed in the courts of common law, and they may, where justice requires it, take notice of matters not strictly proved. *The Peerless*, 1 Lush. 41." Considering that full opportunity is given for taking further evidence on appeal in the circuit court in all admiralty cases, commercial documents that have the highest practical guaranties for their authenticity and correctness, may, I think, rightly be admitted to consideration without formal proof, where such practical vouchers for their authenticity and correctness are supplied, so far as relates to questions that arise incidentally upon the trial, and could not reasonably have been foreseen, so that the parties could be expected to have provided themselves beforehand with formal proof. Such a practice, if permitted within these limits in the interests of justice, should not, however, be extended so as to encourage laches in preparations for trial, or so as to excuse the neglect to procure available proof where the need of it could have been foreseen. Had the

charter-party been designed to be used in defense, on the ground that one of its special clauses made the stevedore the agent of the charterer and not of the ship, that fact should have been pleaded, and the execution of the charter proved.    For the reasons above stated I must hold that the libelant is entitled to judgment for his damages. If the amount is not agreed upon, a reference may be taken to compute the amount.