## Case No. 2,484.

### CARUANA v. BRITISH & N. A. ROYAL MAIL STEAM-PACKET CO.

[6 Ben. 517.] [1]

District Court, S. D. New York. May, 1873.

BILL OF LADING—DELIVERY OF CARGO — NOTICE TO CONSIGNEE WHEN VESSEL IS NOT NAMED IN THE BILL OF LADING.

1. A bill of lading was executed at Malta, on January 2, 1872, acknowledging the receipt there, in good condition, of eighty-five boxes of oranges for shipment to Liverpool, "to be there reshipped on board a Cunard steamer or steamers bound for New York, via Queenstown and (or) Boston," to be there delivered in like good order and well conditioned, on payment of certain freight. It also contained a clause that the goods were "to be taken from alongside by the consignee, immediately the vessel is ready to discharge," or they would be landed and deposited in a warehouse or sent to public store. On the 2d, 3d, or 5th of February, 1872, the consignee named in the bill of lading sent his agent with the bill of lading to the office of the Cunard Steamship Company in New York. He showed the bill of lading to the clerk having charge of the department of inward freight, and asked if the goods named in it had arrived. He was told that they would probably arrive by the Russia, which was to sail from Liverpool on February 3d, and that, on the arrival of any steamer, a list of the cargo and consignees of goods on board of her was published in the Journal of Commerce. The consignee inspected that list on the arrival of the Russia, and not finding his name, sent again to the office, and was told that the goods had not come by the Russia, but, if they were coming, would come by the next steamer. On the arrival of that steamer, his goods were not on her, and he sent again to the company's office, and was then told that the goods had arrived by the China, which came on the 1st of February. Her cargo list had been published on the 3d of February, and on the 5th of February the goods had been sent to the public store under a general order. Before the consignee learned these facts and applied for his goods, they had been sold to pay storage. The consignee filed a libel against the company to recover their value: *Held*, that the publication of the cargo list of the China was not such a notice to the consignee as is requisite to discharge a ship owner from liability under a bill of lading.

[Cited in Unnevehr v. The Hindoo, 1 Fed. 630; The Boskenna Bay, 22 Fed. 665.]

2. That, under such a bill of lading as this, which mentioned no vessel, and on such inquiry as the consignee made, it was the duty of the ship owners to have seen to it that he was advised truly as to the arrival of his goods.

3. That the ship owners were therefore liable, on the bill of lading, for the value of the goods.

[In admiralty. Libel by Carmello F. Caruana against the British & North American Royal Mail Steam-Packet Company.]

Charles Donohue, for libellant.
Daniel D. Lord, for respondents.

BLATCHFORD, District Judge. This suit is brought to recover the value of eighty-five boxes of oranges, shipped at Malta, un-

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

der a bill of lading given by the respondents, the proprietors of a line of steamers running between Liverpool and New York, and known as the "Cunard Line," and consigned to the libellant, at New York. The bill of lading is dated at Malta, January 2d, 1872. It reads thus: "Received, in good order and condition, from Dr. L. Ullo, for shipment to Liverpool, to be there reshipped on board a Cunard steamer or steamers bound for New York, via Queenstown and (or) Boston, eighty-five boxes oranges, being marked and numbered as in the margin," eighty-five boxes, C. F. C., "and are to be delivered, in the like good order and well conditioned, at Jersey City, being within the jurisdiction of the custom house of the aforesaid port of New York, * * * unto C. F. Caruana, Esq., or to his assigns, freight for the said goods being paid on delivery, as per margin," £18 14. * * * "The goods to be taken from alongside by the consignee, immediately the vessel is ready to discharge, or otherwise they will be landed by the master, and deposited at the expense of the consignee, and at his risk of fire, loss or injury, in the warehouse provided for that purpose on the steamship wharf at Jersey City, or elsewhere, or sent to the public store, as the collector of the port of New York shall direct, and, when deposited in the warehouse, to be subject to storage, the collector for the port being hereby authorized to grant a general order for discharge immediately after entry of the ship."

The libel alleges the shipment of the goods under the bill of lading, and avers that they arrived in New York, but the respondents did not deliver them to the libellant, and they became wholly lost to him.

The answer avers that the goods were taken to Liverpool, and there shipped in a Cunard steamer for New York; that, by the usage of trade, notice of the arrival of goods and of readiness to discharge is given by publication in a daily newspaper, notice of the day when the vessel will be ready to discharge being also posted in a conspicuous place in the New York custom house, of which usage the libellant had notice; that the notice of arrival of the goods and of readiness to discharge was duly given in the manner described, and thereupon it became the duty of the libellant to procure a permit for the delivery of the said goods, and to take them from alongside of the vessel when landed; that the goods were landed on the respondents' wharf at Jersey City: that the libellant was not ready to take them, and did not obtain a permit therefor, whereupon they were sent to the public store, under a general order granted by the collector of the port of New York; that, after deposit in the said warehouse, and in consequence of the libellant's neglect to take the same, as he was bound to do by the terms of his contract, the goods became liable to decay and were sold to pay storage, such sale being in

conformity with the usage and custom of trade; and that the respondents are not responsible for the loss on the goods.

The name of the steamer by which the goods were to be sent from Liverpool to New York, is not given in the bill of lading, nor is the day on which they would leave Liverpool stated therein. The days of sailing of steamers of the Cunard line from Liverpool for New York, in January and February, 1872, were as follows: the Java, January 6th; the Calabria, January 13th; the China, January 20th; the Abyssinia, January 27th; the Russia, February 3d; and the Algeria, February 10th. The libellant had no information as to what steamer would bring the goods. On the 2d, 3d or 5th of February (the 4th falling on Sunday), the libellant's son and agent. on his behalf (no information that the goods had arrived having been received by the libellant), went to the office of the respondents, in New York, having the bill of lading with him, and placed it in the hands of a clerk of the respondents in such office, who had charge of the department of inward freight, and asked him if the goods named in it had arrived. The clerk inspected the bill of lading and informed the libellant's son, that the goods would probably arrive by the Russia, which was assigned to sail from Liverpool February 3d. He also then gave to the libellant's son a printed list, as above, of the names of the vessels and the days of their sailing from Liverpool, and informed him that a list of the names of the consignees, and of the number of packages consigned to them respectively, by the vessels of the line, was on their arrival, generally published in a daily newspaper published in New York, called the Journal of Commerce. The libellant was a subscriber to that paper. He watched for the arrival of the Russia, and, when she arrived, examined her cargo list as published in the Journal of Commerce, but it did not contain his goods. They did not come by the Russia. The libellant's son thereupon went to the respondent's office, and saw the same clerk. and asked him if the goods had arrived by the Russia, and was answered that they had not. and was also told by the same clerk, that, if they were coming at all. they would come by the Algeria. The libellant then watched for the arrival of the Algeria, and, when she arrived, examined her cargo list in the same newspaper, but did not find his goods in it. The libellant's son thereupon went to the office of the respondents, and was told by the same clerk. that the goods had not arrived by the Algeria. but had come by the China. which, he said, had arrived about the 3d of February. He demanded the goods, but they were not delivered to him. The China did bring the goods. She arrived on the 1st of February. and was entered at the custom house on the 2d. Her cargo list, containing a statement that she had arrived,

and had brought 85 packages of merchandise for the libellant. was published in the Journal of Commerce on the morning of the 3d of February. The 85 boxes were sent to the public store, under a general order, after 10 o'clock a. m., on the 5th of February. the libellant not having obtained any permit for them, or entered them at the custom house, because he did not know of their arrival.

At the time of the first visit of the libellant's son, the clerk had not seen a manifest of the China's cargo. even if such manifest was in the office. The latest manifest he had seen was that of the Java's cargo. The clerk acknowledges, in his testimony, that the reason he told the libellant's son that he thought the goods would arrive by the Russia was, that he did not think they would reach Liverpool in time to come by either the Calabria. the China or the Abyssinia. The manifests of the cargoes of the various steamers. as they arrived, were taken to, and kept in, the office of the respondents. They were there for reference. On the second visit of the libellant's son. after the arrival of the Russia, and which must have been after the 15th of February, and when the attention of the clerk was called to the goods a second time, the manifest of the China's cargo must have been in the office. showing that the libellant's goods came by her. Yet the clerk did not consult it, nor did he tell the libellant's son that the goods had come by the China. The publication of the cargo lists in the newspaper is not shown to be the act of the respondents, as a notice emanating from them in fulfilment of any duty to give a notice. The answer avers, that. by the usage of trade. notice of the arrival of goods and of readiness to discharge is given by publication in a daily newspaper. and that notice of the day when the vessel will be ready to discharge is also posted in a conspicuous place in the New York custom house. and that the libellant had notice of such usage, and that notice of the arrival of these goods and of readiness to discharge was duly given in the manner described. No such usage is proved. Nor is it shown that the respondents gave any such notice as is averred. Whatever notice the publication of the cargo list of the China was, it is not shown to have emanated from the respondents, nor was there any publication of any notice of readiness to discharge. The libellant had no knowledge or information as to the vessel which was to bring his goods. He sent his bill of lading in abundant season to the office of the respondents. and spread before them all the information he had. which was the date of the bill in Malta. It was their duty. under such a bill of lading, and on such inquiry as the libellant made. to have seen to it that he was advised truly as to his goods. Instead of that, the respondents misled him. They substantially told him that his goods could not arrive sooner than by the Russia,

knowing as they did the date of their delivery in Malta. He could know nothing on that subject. They were bound to know everything. They, in effect, told him that his goods had not arrived by the China, when his son went there after the arrival of the Russia. He cannot be held responsible for not having examined the cargo list of the China, as published in the newspaper of February 3d.

The provision in the bill of lading, that the consignee is to take the goods from alongside as soon as the vessel is ready to discharge, must have a sensible construction. What vessel? None is named in the bill of lading. It is to be "a Cunard steamer or steamers." The respondents could divide the shipment, and send it in parts, by several steamers. The steamer or steamers were to be "bound for New York via Queenstown and (or) Boston." The respondents could send the goods all by way of Boston, or could send some by way of Boston and some direct to New York, and could divide the goods among several steamers. If sent by way of Boston, their ultimate destination being the respondents' wharf at Jersey City, they must reach that wharf by a conveyance other than that in which they left Liverpool. Under such a contract, the consignee is entitled to a notice of the arrival of his goods, and is not obliged to watch for the arrival of a nameless vessel, or for the appearance on the wharf of goods which may come from Boston by one of many means of transport; and, if he does what this consignee did, he does all that is incumbent upon him to entitle himself to receive actual notice of the arrival of the goods, when they do arrive and their arrival is known to the carrier.

There must be a decree for the libellant, with costs, with a reference to a commissioner to ascertain the amount of the damages sustained by the libellant.