ST. JOSEPH, The (DIKE v.). See Case No. 3,908.

ST. JOSEPH & D. C. R. CO. (FARMERS' LOAN & TRUST CO. v.). See Case No. 4,-669.

---

## Case No. 12,231.

### The ST. LAURENT.

[7 Ben. 7.] [1]

District Court, E. D. New York. July, 1873.

SHIPPING—DELIVERY OF CARGO—PRIVATE WHARF — NOTICE TO CONSIGNEE — NEGLIGENCE OF CARRIER.

1. Certain cases of goods were brought to New York on a steamship under an ordinary bill of lading. The owners of the steamship were the occupants of the wharf at which she discharged her cargo, and which they had inclosed. It was their mode of doing business that goods which were to be sent to the custom house under a general order, because their consignees had not obtained custom house permits for their landing, were deposited in a certain place of deposit on the wharf. One of the cases of the goods, after being marked for general order, was seen by a clerk of the steamship company standing in another part of the wharf with the goods of a passenger. They stood there for nearly a day, but the clerk gave no order and did nothing with reference to them. The consignee filed a libel against the steamship to recover for non-delivery of one of the cases. It did not appear that the missing case had ever been put in the place of deposit for general order goods. *Held*, that under the mode of delivery adopted by the ship, it was her duty to deposit the case in the part of the wharf designated for general order goods, and there to watch and preserve it for a reasonable time to enable the proper person to remove it; and the liability of the ship as carrier continued until the expiration of such reasonable time.

[Cited in Unnevehr v. The Hindoo, 1 Fed. 630.]

2. The delivery of the case in question upon the wharf, was not such a delivery of it upon a public wharf with notice to the consignee, as would discharge the ship from liability.

3. There was negligence in the clerk of the steamship in failing to remove the case marked "general order" to the proper deposit.

4. The ship was liable for the loss of the case.

In admiralty.

BENEDICT, District Judge. The question to be decided in this case is whether the evidence shows a constructive delivery to the libellant of a case of merchandise shipped at Havre, on board the steamship St. Laurent. to be transported to New York, and there delivered to the libellant.

One ground taken by the defence is, that the evidence shows a delivery of the missing case to the custom house authorities, who, as it is claimed, were the only persons by law entitled to receive the case, inasmuch as at the time of the landing of the case the libellant had failed to enter it at the custom house and pay the duties.

I am of the opinion that the evidence fails to show such a delivery of the case to the possession of the custom house authorities as would release the ship.

The case, not being permitted, was to be

[1] [Reported by Robert D. Benedict, Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]

taken from the wharf to the general order store by the custom house cartmen. For merchandise of that class there was a place of deposit on the wharf, which had been designated for that purpose by the steamship company. The wharf was their own wharf, which they had inclosed, and where they placed the cargoes of their steamers as they arrived, in accordance with a system which is disclosed in the evidence.

The duty of the ship in respect to this case was to deposit it in that portion of the inclosure, designated for general order goods, and there to watch and preserve it for a reasonable time, to enable the proper person to remove it; and the liability of the ship, as carrier, continued until the expiration of such reasonable time.

The evidence in this case fails to show that the missing case was ever so deposited. It is shown to have come out of the ship, and to have been taken upon a truck by an employee of the ship, and marked for deposit with general order goods; but there is no evidence that it was ever so deposited. It was at least incumbent on the carrier to show the case to have been placed in the place upon the wharf where the carman was to take it. Assuming, then, that there may be a delivery to the custom house authorities, which would release the ship in a case like this, it must, nevertheless, be held, that such a delivery was not accomplished by what was done here.

Another ground taken is, that, inasmuch as the evidence shows the case to have been landed from the ship upon the wharf, in the day time, with notice to the consignee of the discharge of the steamship, and inasmuch as the consignee failed to apply for the case within a reasonable time, the carrier is discharged, unless there be proof of negligence in the care and custody of the goods upon the wharf. But it is entirely plain that this mode of delivery was not attempted by the ship. Here was no delivery upon a public wharf. The steamship landed her cargo at a wharf owned by the steamship company, over which they maintained control, and where they had established a well known method of delivering cargoes. The wharf was inclosed, and in the inclosure was a place designated by the steamship company, and well known as the place, and the only proper place, for the deposit of all general order goods, in which place the employees of the steamship deposited all general order goods, and from which place they were taken by the government cartmen.

The case in question, which should have been deposited in this place, never could be found there, and there is no evidence that it ever went there. It was only after the lapse of a reasonable time after the deposit of the case in the proper place upon the wharf —if then even, under the method of delivery adopted by this steamship—that the liability of the carrier would terminate. No other place upon the wharf than the general order division of the wharf was the wharf within the meaning of the rule which makes landing upon a wharf, and the lapse of reasonable time to take the goods, equivalent to actual delivery.

A third ground of defence is based upon the phraseology of the bills of lading, but this is answered by the conceded fact that the ship obtained a general order for the cargo, and elected to deliver the cargo according to the system established on that pier.

These views make it unnecessary to consider whether, under the method of delivery adopted by this vessel, her liability as carrier for general order goods did not continue until the goods passed the gate leading from their inclosed wharf, where they had stationed a clerk who examined the loads as the carts passed out, took receipts if the goods were found correct, and turned back all goods not entitled to be taken by the cartman who was removing them. Nor is it necessary to discuss what lapse of time should be considered sufficient to terminate the ship's custody of goods, which she elects to deliver under a general order, when not the owner of the goods, but officials have the sole power to determine with what dispatch they will remove goods from the wharf.

In addition to these features of this case presented by counsel, there appears to me to be the further feature that the evidence affirmatively shows negligence on the part of the steamship in the care and custody of this case, after it was landed from the ship.

The evidence of the clerk of the steamship who had charge of the landing of this cargo is that he knew that the cases called for by this bill of lading were to be deposited in the general order division of the wharf, and that they were so marked while yet in the custody of the employees of the ship; and he also says that he saw one of the cases mentioned in this bill of lading, and which was believed by the employees of the vessel to be, and which doubtless was, the one now missing, in a place other than the general order division of the wharf, remaining out of any designated portion of the wharf, and standing with some goods of a passenger which were waiting for examination on the pier. There the case remained nearly all day, and yet the clerk did nothing, and said nothing, and knows nothing of what became of it. In my opinion, considering the method pursued in landing this cargo, the allowing such a case as this, after being marked for general order, to remain in such an irregular place for nearly a day, without calling attention to it, or directing its removal to its proper place, was negligence sufficient to render the ship liable upon that ground alone.

In either aspect of the case the decree must be for the libellant, with an order of reference.

## Case No. 12,232.

### The ST. LAWRENCE.

### [1 Gall. 467.] [1]

Circuit Court, D. New Hampshire. Oct., 1813. [2]

PRIZE—PROPERTY IN ENEMY COUNTRY—RIGHT TO BRING AWAY — CONDEMNATION — SHIP'S PAPERS—CLAIM—NATURALIZATION.

1. A naturalized citizen cannot lawfully bring away his property from an enemy country after a knowledge of the war, without the license of the government.

See Curtis, Adm. Dig. pp. 203–209, where the cases may all be found. [See Case No. 12,258].

[See The Mary, Case No. 9,184.]

2. An obstinate suppression of the ship's papers, &c. coupled with a voyage from an enemy country, is sufficient cause of condemnation.

3. It is irregular for a mere nominal agent to interpose claims for his principal, where they are within the jurisdiction.

[Cited in Spear v. Place, 11 How. (52 U. S.) 527.]

4. If a party put himself in itinere to return to his native country, he is already deemed to have assumed the native character.

In admiralty.

Cummings & Pitman, for captors.
Mason, Webster & Cutts, for claimants.

STORY, Circuit Justice. The ship St. Lawrence and cargo were captured by the privateer America, John Kehew commander, on the 20th of June, 1813, on a voyage from Liverpool in Great Britain to the United States. From the papers and preparatory examinations it appears, that the St. Lawrence is an American ship; that she sailed from New York in the spring of 1812, and arrived at Liverpool in the ensuing summer. From thence she sailed to some port in Sweden, or in the Baltic, with a British license to protect her on her voyage thither, and on her return to Liverpool and the United States. She was frozen up in some northern port during the last winter, and returned to Liverpool in April, 1813. During all this time, she was owned by Messrs. Thompson & Dickey, American merchants residing at Baltimore. Early in the month of May, 1813, the agents of Messrs. Thompson & Dickey at Liverpool contracted for the sale of the ship, or actually sold her to the mercantile firm of Messrs. Ogden, Richards, & Selden, (of whom the two latter are resident merchants at Liverpool, and the former at New York,) the one half on their own account, or the account of one of the partners, the other half on account of the claimant, Mr. Alexander McGregore. After this supposed sale, the present master was appointed to the command by Messrs. Ogden, Richards, & Selden. No bill of sale of the ship was actually made, and the contract was left to be ratified by the original owners in the United States. No transfer has ever been made by the latter, and yet the ship is now claimed by Messrs. Ogden & McGregore, as their own property.

The cargo, which, with a very inconsiderable exception, consists of British manufactures, was taken on board at Liverpool, and the ship sailed from thence about the 30th of May, 1813, protected by a British license and passport from Lord Sidmouth, against British capture during the voyage. Mr. McGregore and family were passengers in the ship. From his examination in preparatory, and the papers on board, it appears that he is a native of Scotland; that in January, 1795, he was naturalized as a citizen of the United States; that for the last seven years he has resided, as a merchant, in Liverpool, where he married his present wife, and where four of his children were born. He seems to have received his permission to come to the United States, in the character of a British subject, by a passport from Lord Sidmouth; whereas the passports to other passengers, who were American citizens, were from the alien office. Mr. McGregore does not pretend that his residence in Liverpool was for temporary purposes; and it must therefore be taken upon general principles, as his place of permanent domicile for purposes of trade. The bills of lading of the cargo, which are all in a general form, consigned "to order," were delivered up to the captors; but all the invoices and letters, which respected the title and character thereof, though admitted to have been on board, were retained and suppressed by the master, who, to use his own expression, "has done with them what he had a right to do." Mr. McGregore states, that they have been delivered to the consignees. However this may be, they have been and still are studiously and obstinately suppressed; and have never been offered to the view of the court.

The conduct of the master is in the highest degree reprehensible. He has been guilty of a flagrant breach of duty; and since the suppression has been persevered in and countenanced by the consignees, it cannot but afford the most violent suspicions of concealed enemy interests. Under such circumstances, it would be difficult to relieve the great majority, if not the whole of the claims, from the imputation of an hostile character; and, coupling the suppression with the origin of the voyage, I should hold it my duty to pronounce a general confiscation. The cause however may well be disposed of upon other more general grounds, and I shall therefore waive the decision of it upon that, to which I have alluded.

Various claims have been interposed, independent of those of Messrs. Ogden & McGregore, (which cover the ship and part of the cargo) in behalf of citizens of the United States. The claiming party however, in all these cases, is Mr. Ogden, who seems to act

as general agent for all concerned. I cannot approve of this course. Where the parties live in the United States, and are under no disability, I can perceive no law or reason to countanance a claim and affidavit by a mere nominal agent. It cannot but lead to the most unjustifiable irregularities, and perhaps to the most mischievous frauds. A nominal party may set up his pretensions before the court, and, while he makes no affidavit of real interest, may find an easy agent to credit or to assert any plausible tale before the court, without any hazard of detection. I do not pretend to impute any such misconduct to the present parties; yet I think it would be difficult to say, that their conduct might not, if strictly scrutinized, warrant such an interpretation. I disclaim however any intention to make the inference, in this case.

All the claims thus interposed by Mr. Ogden, with one exception, claim the property as purchased with funds or debts due in England before the war. Mr. Penniman's claim alleges, that the goods were actually purchased before the war. Now I cannot but remark, that if these facts were material, it would be somewhat difficult to conjecture, how they should have been known to Mr. Ogden. He must take them upon the assertion of the parties; and if so, I beg to know, why they cannot also assert the facts in a more solemn manner, and with more solemn proof to the court?

The facts, however, are not in my judgment material. It is a principle of settled law, which cannot now be brought into controversy, that all trade with the public enemy without a license is illegal, and subjects the property engaged therein to condemnation. And it is no excuse, that the property was purchased before the war, much less that the funds only, and not the purchase, existed before the war in the enemy country.

The cases of The Lady Jane. The Juffrouw Louisa Margaretha. The William, and The St. Philip, cited in The Hoop, 1 C. Rob. Adm. 196. and Potts v. Bell. 8 Term R. 548, would alone be decisive; and on principle it seems to me, that the same must be the legal result. These cases clearly show, that the circumstances of funds in an enemy country, or purchase of goods before the war, will not shelter the party from the operation of the rule, as to illegal traffic. I will not, therefore, take up time by any elementary reasoning on the subject.

The claim of Mr. McGregore seems to have received a distinct consideration in the district court, upon the supposition that he was to be deemed an American citizen changing his domicile, and in itinere to resume his American character. I will not stop to consider, whether this is true in point of fact; because, admitting it in the broadest terms, it cannot exempt his property from confiscation. If an American citizen could not lawfully go to Great Britain, and take away

merchandize purchased before the war, I am at a loss to perceive, how an American citizen, domiciled there, could acquire higher privileges. It is not pretended that Mr. McGregore purchased these goods before the war, and I will add, that he has not, in any affidavit, given us any particular account of the ownership. We have his word only for the title and the extent of his claim; a claim also made by an agent, although he was himself upon the very spot.

The cases, in which the party's putting himself in itinere, to return to his native country, has been held to exempt his property from the hostile character acquired by the residence, are cases where such property has been engaged in a trade completely lawful in the native character. But the principle never has been and never could be extended to protect a trade, which was illegal in a native citizen; more especially a trade which in the native character would be in the highest degree noxious. This distinction pervades the cases, and reconciles all the apparent inconsistency. See The William, cited in The Hoop, 1 C. Rob. Adm. 196, and 8 Term R. 548; The Indian Chief, 3 C. Rob. Adm. 12.

In either view, therefore, in the character of a British subject or an American citizen, Mr. McGregore's property is liable to confiscation. I should have been glad to have avoided the decision of this claim, from motives of delicacy, which are known to the counsel; but it has been required at my hands, and if I am wrong, it is a source of great consolation, that the cause can go to the highest tribunal.

As to the adventure claimed by Mr. Webb, the master, it appears that it consists partly of Russian manufactures, sent by him to England, and partly of British manufactures, purchased since the war, from his funds previously remitted there. Mr. Webb sailed from Archangel in June, 1812, and arrived in England in the following October. The goods purchased in England must of course be condemned. As to the Russian goods, I should have been glad to have given them a more indulgent consideration. But no case exists, to my knowledge, in which the origin of the goods has afforded a favorable distinction, to exempt them from the general rule. They are not of great value, and I hope that the captors, notwithstanding the master's misconduct, will not insist upon an application of the unrelaxed rule, in its full rigor, to either part of the master's adventure.

The claim of Messrs. Ogden & McGregore, so far as respects the ship, is utterly unsupported in fact. But let the ship belong to whom she may, enemies or citizens, she must share the general fate of the cargo.

I reverse the decree of the district court, reject the claims of the parties, and also the claim of the United States, interposed for a forfeiture of the ship and cargo under the non-importation act, and condemn the whole, as good and lawful prize to the captors.

After this decree was rendered, and an appeal allowed to the supreme court, the captors moved for a sale of the ship and cargo.

STORY, Circuit Justice. I consider that this motion is to be granted almost as of course. The practice is well settled; but considering all circumstances I shall order the proceeds of the sales to be retained by the court, and deposited in the public banks at Portsmouth, to await the final orders of the court.

[NOTE. On appeal to the supreme court the decree of the circuit court was affirmed, with costs, except so far as it condemned those portions of the cargo claimed by Penniman and McGregore, which the court decided to hold over until the next term. 8 Cranch (12 U. S.) 434. At the next term the judgment of the circuit court as to these claims was affirmed. 9 Cranch (13 U. S.) 120. Pending these two hearings, the cause having been remanded for further and final proceedings, an application was made to have the shares of the captain and some of the crew, when ascertained, paid into the hands of their particular agents, and not into the hands of the supposed general agent of the ship. The application was referred to commissioners. Case No. 12,233.]