## UNNEVEHR *v.* THE STEAMSHIP HINDOO, etc.

*(District Court, S. D. New York. February 12, 1880.)*

COMMON CARRIER—BILL OF LADING—LIMITATION OF LIABILITY—NEGLIGENCE—LOCKWOOD V. R. CO. 17 WALL. 357.—Where a common carrier has been guilty of negligence, he cannot avail himself of a provision in a bill of lading limiting his liability to £100.*

SAME—CONSIGNEE—NOTICE OF TIME AND PLACE VESSEL WOULD DISCHARGE CARGO.—The mere fact that the libellant's agent knew of the arrival of the ship does not dispense with the necessity of actual notice of the time and place the vessel would discharge her cargo.

SAME—NEGLIGENCE—GOODS ON PIER AWAITING TRANSFER TO PUBLIC WAREHOUSE.—A ship is liable *in rem* where goods are stolen through negligence, while still in the custody of the owners of the ship, after being discharged on a pier, and waiting to be conveyed to the public warehouse by the public carman.

In Admiralty.

*E. Root,* for libellant.

*W. R. Beebe,* for claimants.

CHOATE, J. This is a libel to recover the value of a box of merchandise shipped at Hull, England, under bill of lading, and to be delivered in New York. The steamship arrived on Sunday, the fourth of June, 1877. There were eight boxes shipped and consigned to the libellant. They were discharged upon the steamship's pier, in Hoboken, in the forenoon of Tuesday, the sixth of June, and remained on the pier when it was closed at night. During the night one box was stolen from the pier by river thieves, and it is for this box that the suit is brought. Several defences have been attempted.

1. It is claimed that the libellant has been guilty of fraud

*See *ante,* 382.

in respect to the contents and value of the box in making a claim in this suit which he knew to be far beyond its real value. He claims that the case was worth $8,000, the contents being chiefly valuable photographic negatives, books and pictures, with household goods, bedding, etc. A great deal of evidence has been taken bearing upon this issue. The libellant has sworn to the contents of the box, and he is corroborated to a considerable extent by other testimony.

In respect to the value of the negatives, which constitute the chief part in value, it appears that the libellant had sold out to one Cooper the models from which the negatives were taken, and had, by his agreement with Cooper, disentitled himself to make profitable use of at least some of the negatives in this country. The proper valuation of the negatives, considering the agreement with Cooper, may be very difficult to ascertain, but I am not satisfied that the valuation put upon them by the libellant is so extravagent and purposely so exaggerated as to make the present claim fraudulent.

The circumstances chiefly relied on by the claimants as sustaining this defence seem to me of very little weight, and, upon the whole testimony I think they have failed to establish the fraud set up in the answer.

2. Another defence is that by the bill of lading the limitation of liability is fixed at £100. It is enough to say that this limitation is no answer if negligence be proved. *Lockwood* v. *R. Co.* 17 Wall. 357.

3. Unreasonable delay of the consignee, after notice by public advertisement of the time and place of discharge, according to the alleged custom of the port, is also relied upon as a defence. The point made is that after a reasonable time was afforded to the consignee to take away his goods upon their being unladen, the liability of the ship *in rem* ceased; that even if there was negligence afterwards, for which the shipowners might be responsible in a new relation of warehousemen, the ship is not so liable. And it is insisted that the consignee should have come for his goods during the day, Tuesday, and that his delay beyond 5 o'clock on that day was unreasonable, and discharged the ship from all liability.

The general principle is well settled that the consignee, on receiving notice of the time and place of discharge, must attend and take his goods within a reasonable time. *Price* v. *Powell*, 3 N. Y. 322; *Sprague* v. *West*, Abb. Adm. 552; *The Santee*, 2 Ben. 523; *The Prince Albert*, 5 Ben. 386; *The Kathleen Mary*, 8 Ben. 169. But there are several reasons why this defence is not available to this ship in the present case. No actual notice of the time and place of discharge was given to the libellant. The claimants rely on a constructive notice, by publication in the *Journal of Commerce*, and have attempted to show a custom or usage within which they seek to bring this case. The evidence, if it establishes any usage in this respect, shows that the custom of steamship companies is to give a notice of three or four days. In this case only one day's notice was proved. The evidence as to the usage is also conflicting.

The fact that the libellant's agent in New York knew of the arrival of the ship does not dispense with notice of the time she would discharge. These eight cases were, in the absence of an invoice, passed through the custom-house by the libellant's agent on Monday, the fifth day of June, upon an application for an appraisement, in such a way that it was necessary for them to go to the appraiser's store. Accordingly, they were not to be received by the consignee, from the ship, like goods for which a permit was obtained. They were to go to the public store, and to be taken there by the cartmen employed by the custom-house authorities. And the proof is that the claimants land on their pier goods which are to go to the public store; that while on the pier they pass the custom-house officer stationed there for the purpose, among other things, of passing such goods and of seeing that they do go to the public store; and when they are taken by the public store carman the ship takes the carman's receipt for them on the ship's cargo delivery book.

The proof is that the custom-house officials merely exercise such supervision over goods, discharged as is necessary to prevent their being taken away without a permit; or, if they be not permitted goods, by any other person than the public

store carman. The custom-house does not assume any such possession or custody of the goods while on the pier as relieves the ship from their safe-keeping till they are delivered in due course of business to the public store carman. The pier was in the exclusive occupation of the claimants, and the gates at the head of the pier were locked by them at night. Custom-house inspectors remained on the pier during the night. In the present case the necessary order authorizing the custom-house inspector to have these eight cases sent to the public store was not received by them at the pier in season for them to be carted away on Tuesday afternoon, and in fact the goods did not pass the inspectors and receive their mark showing their destination that day. This was done as to the seven cases that remained the next morning.

Whether this delay was unusual in the routine of custom-house business, or if so who was chargeable with fault in this delay, is not shown. Nor does it appear that the libellant could have done anything to prevent the delay in carting the goods to the public store. Nor if he had gone to the pier could he have taken the goods away. Under these circumstances, it is clear that he is not chargeable with any unreasonable neglect to receive the goods. The course of business on the part of the claimants as to goods destined for the public store was shown to be such that there was no delivery of them until their delivery to the public carman. See the *St. Laurent*, 7 Ben. 7; *The Ville de Paris*, 3 Ben. 276; *Carnana* v. *Packet Co.* 6 Ben. 517.

4. It is also insisted that the claimants used proper diligence in the watching of the goods during the night. The pier was about 700 feet long, and was covered by a close shed, in which there were left five openings, two on one side, and three on the other. The interior of the shed was well lighted with gas. These goods were lying nearly opposite one of the openings, and about 200 feet from the gate at the inner end of the pier. The pier is open underneath, so that small boats can pass through from side to side.

Claimants employed one watchman, who, about half past 1 o'clock, heard a noise at the lower end of the pier. Before

that time he had been near the upper end of the pier. On hearing this noise he went to the lower end of the pier and remained there, on the outside and on the inside of the shed, an hour or more. Meanwhile the libellant's box was taken away by river thieves. Comment seems unnecessary. It was a clear case of negligence.

Decree for libellant, with costs, and a reference to compute damages.