MIDDLEBORO SHOVEL CO., In re. See Case No. 14,168.

———

## Case No. 9,533.

### The MIDDLESEX.

[Brun. Col. Cas. 605;[1] 21 Law Rep. 14.]

Circuit Court, D. Massachusetts. 1857.

#### CARRIERS—DELIVERY ON WHARF—USAGE AS TO DELIVERY.

1. To constitute a good delivery of goods from a ship upon a wharf, there must be a reasonable notice to the consignee that the goods will be so unladen; a knowledge casually acquired by the consignee that the vessel has arrived and will discharge at a certain wharf will not dispense with such notice.

[Cited in Mordecai v. Lindsay, 5 Wall. (72 U. S.) 495; One Thousand Two Hundred and Sixty-Five Pipes, etc., Case No. 10,536; The Boskenna Bay, 40 Fed. 93; Constable v. National Steamship Co., 154 U. S. 51, 14 Sup. Ct. 1076.]

2. A usage for wharfingers to act as agents in accepting, in behalf of consignees, goods arriving at their several wharves, would not be valid.

[Appeal from the district court of the United States for the district of Massachusetts.]

In admiralty.

[1] [Reported by Albert Brunner, Esq., and here reprinted by permission.]

J. P. Healey, for libelants.

R. H. Dana, Jr., and H. A. Scudder, contra.

CURTIS, Circuit Justice. This is a libel founded on a bill of lading in the usual form, signed by the master of the ship Middlesex at New Orleans on the 19th day of March, 1855, agreeing to deliver sixty barrels of lard at the port of Boston unto the libelants or their assigns, dangers of navigation only excepted. The ship arrived in the port of Boston on Saturday, the 21st day of April, 1855, and commenced discharging cargo on Tuesday, the 24th. On Thursday, about five o'clock p. m., a small part of the libelants' merchandise was discharged; and in the course of Friday, before half past two o'clock, thirty-one barrels thereof had been landed on the wharf. They came out promiscuously with other merchandise, and were so stowed on the wharf. It does not appear that at any time any considerable quantity was accessible, so that it could have been taken away by the libelants. No notice of the arrival of the vessel, and that her cargo was about to be discharged, was given by the master to the libelants. But Wilde, a clerk of the libelants, without any direction to that effect from his employers, went to the vessel, on Wednesday or Thursday, and inquired of the mate if the merchandise was ready for delivery; he replied, it was not, and he could not tell when it would be. He then asked the mate if he would notify the libelants when the merchandise should be ready, and the mate said he would. He thereupon gave the mate the libelants' business card, and asked him if he knew where the libelants' place of business was; the mate took the card, and said he did, or ought to, for he was a "North End boy." The fact that the vessel was at Battery wharf, and the result of this interview with the mate, was made known to the libelants by Wilde on the day when it occurred. The mate denies that he made an absolute promise to give notice; but I do not deem this material, because the libelants were informed that he did. So much of this merchandise as had been landed on Friday was destroyed by an accidental fire which broke out on the wharf about half past two o'clock on that day.

Upon this state of facts I do not think the notice of readiness to deliver, required by law, was given. When the master, or the owners, or consignees of the vessel give notice to consignees of cargo that the vessel is about to discharge at a particular wharf, it is deemed equivalent to a declaration by him or them that the master will be in readiness to deliver the cargo there at some proper time, as soon as, by the use of due diligence, he can get it out of the vessel in a state to be delivered. But mere knowledge that the vessel has arrived, and is discharging at a particular wharf, gained in some casual manner by the consignee, without any act on the part

of the master to indicate a readiness to deliver, is not within the usage, which is for the master, or some agent for the vessel, to give notice to the consignees. And I do not think such casual knowledge is sufficient to impose on the consignee the duty of attending to the discharge of the vessel, and being in readiness to receive his goods as soon as they are ready for delivery. I think a consignee of cargo may well say: "I knew it was usual for some agent of the vessel to give express notice to consignees. No such notice was given. I inferred that for some cause the master would not be ready within a reasonable time to deliver my cargo, and I consequently made no preparation to receive it." It must be remembered that it is not knowledge of the arrival of the vessel and that she is discharging, but notice of the readiness of the master to deliver, which is the operative fact. And to convey this notice the master, or some one acting for the vessel, should give such notice, or some notice, which by custom is equivalent to it. In this case the libelants, at the same time when they were informed by their clerk, that the vessel was discharging at Battery wharf, were also informed that the mate could not tell when their merchandise would be ready for delivery, and had engaged to give them notice when it should be ready. I do not think the mate had authority to bind the vessel by this engagement. But I consider that these circumstances are material when coupled with the want of notice by any one representing the vessel; and that the libelants were not bound to make preparations to receive their consignment until they had some further notice.

But there is another ground on which, in my opinion, this case must be decided in favor of the libelants. Their consignment was but a very small part of the entire cargo of the vessel. The part of it which was landed was stowed on the wharf promiscuously with the residue of the cargo. I do not think the consignee of a parcel of merchandise is required to overhaul the residue of the cargo on the wharf to find his goods. For the convenience of the vessel a particular consignment may be stowed in any proper place in the vessel, and even mingled with goods belonging to others, and it must come out as it is reached in the process of unlading. But each consignee has a right to have his goods delivered to him separated from all others; and the duty of separating them from all others is part of the duty of delivery. No doubt there must be, as in practice I believe there is, a reasonable co-operation between the master and the consignees of cargo in the process of delivering it, and especially in cases of general ships, of large tonnage, such as are now employed. The consignee cannot justly expect, and cannot lawfully require, that upon a crowded wharf, where a large cargo is being delivered to numerous owners, each consignment should be set apart by itself, and so placed as to be most easily accessible. That should be done which may be done reasonably and is usually done in similar circumstances. But there is no evidence in this case to show, and it is not to be presumed that all that is usually done by the master in a case like this, is to pile thirty-six barrels belonging to a particular consignee promiscuously with other cargo discharged on four different days. I cannot say that, when so placed, the libelants' goods were ready for delivery, and therefore I hold that their contract for delivery had not been performed when the fire took place.

It was urged in the case, that, as it appears to be the usage for consignees to pay wharfage on their goods, the wharfinger is the agent of the consignees to accept a delivery of the goods, and consequently, as soon as landed on wharf, the goods are delivered to the consignee. I suppose the usage mentioned is for consignees who accept goods to pay their wharfage, and for consignees who do not accept goods not to pay it. I do not believe there is any usage which makes wharfingers the agents of the consignees to accept consignments for them; and if such a usage were proved, I could not admit that it was a reasonable or lawful usage. It would be inconsistent with the nature of the employment, and would lead to too much confusion of rights to be tolerated. The acceptance of the goods by the consignee, independent of any usage, may be sufficient to raise an implied promise to pay their wharfage; and the usage spoken of is probably nothing more than a practical conformity to those rights and duties of the parties which grow out of the rules of law. That, in my opinion, landing is not delivery. I have already stated in the Case of the Salmon Falls Company.

It was also insisted that the consignees could not maintain a libel founded on the bill of lading alone, without some further evidence of their ownership of the goods. I consider this question to have been settled in the case of Lawrence v. Minturn, 17 How. [58 U. S.] 100. The same was held at common law in Tronson v. Dent, 8 Moore, P. C. 419.

The decree of the district court must be affirmed, with six per cent. damages and costs.

Delivery on the wharf of goods from a ship is sufficient if notice thereof be duly given to the consignee, and consignments are properly separated so as to be conveniently open to inspection. See The Eddy, 5 Wall. [72 U. S.] 459, citing above case.

MIDDLESEX CO. (WHIPPLE v.). See Cases Nos. 17,519 and 17,520.

MIDDLETON (SHIELDS v.). See Case No. 12,786.