## THE BOSKENNA BAY.

### ROLFE *v.* THE BOSKENNA BAY.

*(Circuit Court, S. D. New York. October 7, 1889.)*

1. SHIPPING—CARRIAGE OF GOODS—BILL OF LADING—STIPULATION — SUBSTITUTED DELIVERY.

The clause in a bill of lading, providing that the consignee is bound to be ready to receive his cargo on ship's readiness to discharge, and, in default, that the master may land it upon the wharf where the ship lies for discharge, without notice, and at consignee's risk, construed as authorizing a discharge without notice, but not as relieving the ship from the duty of exercising reasonable care to protect the goods as long as they are, or ought to be, under the control of the master, is a reasonable and valid stipulation, and, where the consignee is not ready to receive, authorizes a substituted delivery of green fruit, in cold weather, by landing the same upon the wharf, at his risk, provided that, if present, he could have removed it without injury. Reversing 22 Fed. Rep. 662.

2. SAME—BURDEN OF DILIGENCE ON CONSIGNEE—WAIVER OF NOTICE.

Under such provision, the consignee is bound to watch for the ship's arrival, and be ready to receive the goods at the time and place they are deliverable; and, in default, the ship may land the cargo without previous notice.

In Admiralty. On appeal from district court. 22 Fed. Rep. 662.

Libel to recover damages to fruit, through its alleged improper discharge from the steam-ship Boskenna Bay on March 21, 1883, and exposure to frost.

*Franklin Bartlett,* for libelant.
*E. B. Convers,* for claimants.

WALLACE, J. The libelant sues to recover damages for injury to a consignment of fruit. The fruit was injured by its exposure to frost, after nightfall, and during the night of March 21, 1883, while remaining in an inclosed pier, No. 44, North river. It was part of a cargo shipped at Palermo to various consignees at New York, by the steamer Boskenna Bay, under bills of lading, which provided for a delivery in good order to the consignee or assigns, "from the ship's deck, where the ship's responsibility shall cease." The bills of lading also contained this condition:

"Simultaneously with the ship being ready to unload the above-mentioned goods, or any part thereof, the consignee of said goods is hereby bound to be ready to receive the same from the ship's side, either on the wharf or quay at which the ship may lie for discharge, or into lighters provided with a sufficient number of men to receive and stow the said goods therein; and, in default thereof, the master or agent of the ship, and the collector of the port, are authorized to enter the said goods at the custom-house, and land, warehouse, or place them in a lighter, without notice to, and at the risk and expense of, the consignees of said goods after they leave the deck of the ship."

The steamer arrived at the port of New York, March 18th, was berthed at pier 44, March 19th, made preparations to discharge March 20th, but, owing to the coldness of the weather, deferred discharging the fruit until March 21st, on which day, the weather being sufficiently mild, she commenced to discharge in the forenoon, and continued till about 5 o'clock in the afternoon. The libelant was not formally notified by the ship's agent or master of the intended time and place of discharge, but he knew of her arrival, and on March 20th made entry of his fruit at the custom-house, and obtained a permit for its removal from the dock, and on the morning of March 21st he paid the freight on his consignment, and received his delivery order. In landing the cargo the several consignments were separated, each lot being placed by itself. A number of the owners of different consignments were present, but the libelant was not present. The building in which the fruit was left was a safe place, but was not sufficiently warm to protect the fruit from the weather at freezing temperature, and the fruit was placed in proper custody. None of the various consignees who were present removed their fruit, but all that was landed from the ship, including the fruit of the libelant, was allowed to remain in the building until the next day, without any special protection against frost. Succinctly stated, the facts are that the cargo was landed at a suitable place for temporary purposes, and at reasonable hours, and in weather suitable at the time, and if the libelant had been present he could have examined and removed his fruit before any risk from cold weather attached; but the state of the weather was such as to denote risk of injury to the fruit from frost if it was suffered to remain overnight at the place where it was left.

Upon these facts the case turns wholly upon the effect which should be attributed to the special conditions of the bill of lading. That instru-

ment was the contract between the parties, and its provisions, so far as they are valid, conclude the libelant. Were it not for these special conditions, the liability of the ship to answer for the loss would be unquestionable. The duty of a carrier by water towards an owner of goods is not satisfied until a proper delivery has been made to the owner; and, unless a valid substituted delivery has been made, the strict responsibility of the carrier as an insurer of the goods does not terminate until actual delivery. If he does not deliver to the consignee actually, he must justify his substituted delivery by showing that it was in accordance with the terms of the particular contract, or with the usage of the port, or with the course of business between the parties. On the other hand, the consignee is bound to watch for the arrival of the ship, and be ready to receive the goods at the time and place at which they are deliverable. If the consignee refuses or neglects to accept the goods, the carrier must, if practicable, give notice to him of the time of the intended discharge; and, when this has been done, and the goods are discharged in a usual and proper place, and at the proper time, the substituted delivery stands in the place of an actual delivery. These are familiar rules of the law of carrier and consignee. No notice was given in the present case, and, except for the special clauses of the contract, the discharge of the goods as made would not have been a delivery. The special conditions are plainly intended to relieve the carrier of any obligation, either to make actual delivery of the goods to the consignee, or to give him notice of the time or place of their intended discharge. As they are explicit, they preclude resort to any usage to define the rights and duties of the parties. Neither the condition for delivery "from the ship's deck, where the ship's responsibility shall cease," nor the condition whereby the consignee is to receive the goods "simultaneously with the ship's being ready to unload," absolves the carrier from the duty of making a proper delivery, actual or substituted; and it would, nevertheless, be incumbent upon the carrier to give due and reasonable notice of the time of intended delivery, and put the goods in a suitable place, under proper care and custody, to constitute a good delivery in the absence of the consignee. *The Santee*, 7 Blatchf. 186; *The Middlesex*, 21 Law Rep. 14; *Gleadell* v. *Thomson*, 56 N. Y. 194; *Tarbell* v. *Shipping Co.*, 110 N. Y. 170, 17 N. E. Rep. 721.

But the further clauses by which it is conditioned that, in case the consignee is not ready to receive the goods when the ship is ready to unload, the master or agent of the ship may land the goods at the wharf where the ship lies to discharge, without notice to the consignee, and at the risk of the consignee after the goods leave the deck of the ship, have no significance whatever, unless they mean that the consignee is not to be entitled to notice of discharge of the goods, and that they are to be at his risk, when landed at the place specified, if he is not ready to receive them when the ship is ready to unload. Unless the clause dispensing with notice to the consignee is intended to permit the carrier to make a substituted delivery in place of an actual one, without previous notice to the consignee, it is wholly inoperative, because notice of landing or warehousing goods, or that the ship is ready to discharge, is unneces-

sary when notice of intended delivery has been properly given. According to the contract also, when the goods are thus landed on the wharf at which the ship lies for discharge, they are to remain there at the risk of the consignee after they leave the ship's deck. Taking all the clauses together, by the bill of lading the consignee has, in effect, said to the carrier: "If you will transport my goods to New York for the freight mentioned, I will waive notice of delivery, and be ready to receive them when the ship is ready to unload them; and, if I am not thus ready to receive them, I consent that they may be landed, and remain at my risk at the wharf where the ship may lie for discharge." Although exemptive provisions in bills of lading intended to relax the obligations of carriers in essential matters are not favored, and will not be extended beyond the narrowest construction of which they are reasonably capable, the courts cannot refuse to give effect to their explicit and unequivocal meaning, unless they are void because contrary to public policy. The terms of the present contract would not justify the carrier in discharging the goods at an unsuitable time or place, so as to expose them to obvious danger of being injured. If an unfit wharf were selected, or unfit weather, or an hour of the night when the consignee could not have a fair opportunity to examine his goods and remove them, the discharge would not be a good delivery within the proper interpretation of the contract. The language used is satisfied by placing upon it a more restricted meaning. It is not to be read so literally as to frustrate the beneficial objects of the transaction to which it relates, and it cannot be supposed that the parties intended to protect the carrier against responsibility for his willful misconduct. Nor would the rules of interpretation of contracts authorize it to be read as intended to shield the carrier from the consequences of his own negligence. It was declared in *Magnin* v. *Dinsmore*, 56 N. Y. 168, that a contract with a carrier will not be deemed to except losses occasioned by his negligence, unless that be expressly stipulated. The authorities are unanimous that no exception, which is not contained in the contract itself, can be ingrafted upon it by implication, either to excuse its non-performance or the exercise of ordinary care in performing it. It suffices to refer to, *Navigation Co.* v. *Bank*, 6 How. 344; *Railroad Co.* v. *Manufacturing Co.*, 16 Wall. 318; and *Bank* v. *Express Co.*, 93 U. S. 174.

Construing the contract as one that authorizes a discharge of the goods without notice to the consignee, but not as one relieving the ship from the duty of exercising reasonable care to protect them so long as they are, or ought to be, under the control of the master, it hardly seems debatable that such a contract is lawful. Judge Story says: "However universal the custom may be to deliver the goods to the owner at the place of destination, still the parties may, by their contract, waive it, and if they do the carrier is discharged." Story, Bailm. § 541. It cannot be doubted that if after the arrival of a ship the consignee instructs the master that he will not require notice of discharge of his goods, but will be ready to receive them whenever the ship is ready to unload at the wharf where she may lie, and that if he is not ready the master may

leave the goods upon the wharf, the latter would be justified in acting upon the instructions. Nor can it be doubted that if the goods were discharged under such circumstances, pursuant to the instructions, the consignee would be estopped from questioning the sufficiency of the delivery. He could be heard to complain in case the master should discharge the goods at an unreasonable time, or should fail in some other respects to exercise reasonable care in respect to them, but not otherwise. If it is competent for the carrier and the consignee to agree upon a particular mode of delivery after the ship has arrived at the port of destination, it is not apparent why it is not equally permissible to do so at the time the goods are shipped. It has been decided that a usage by a carrier, known to the consignee, to leave goods at his usual stopping places, without notice to the latter, is equivalent to an actual delivery of the goods. *Gibson* v. *Culver*, 17 Wend. 305; *McHenry* v. *Railroad Co.*, 4 Har. (Del.) 448; *Price* v. *Powell*, 3 N. Y. 322. Indeed the whole doctrine respecting constructive delivery by carrier to consignee is founded upon usage so general that it has become a part of the commercial law. A special usage has the effect of an express stipulation, because the law implies that it is incorporated in the contract between the parties, and no usage which is contrary to public policy will be recognized. If a good substituted delivery may be had without notice to the consignee, because a special usage or the course of business between the two parties sanctions it, upon principle and analogy the same result must follow where the parties have consented to it by an express contract.

It follows from what has been said that the ship in the present case made delivery of the goods to the libelant according to the contract, and that the contract was a valid one. Undoubtedly there are cases in which the duty of a carrier to a consignee is not wholly satisfied by a valid substituted delivery of goods. The carrier, as in the case of the steamship lines or railway companies which have warehouses at the termini of their carrying points, may, pursuant to usage or the recognized modes of doing business, deliver to himself as warehouseman. He then becomes subject to the liabilities of a warehouseman. So, also, the carrier, although he may not become a warehouseman, may become a bailee of some other description, and remain liable in the capacity in which he receives or deals with the goods. And under no circumstances is it conceivable that the carrier, in making a substituted delivery of goods, would be justified in abandoning them, or negligently exposing them to injury. Subject to these qualifications, the carrier discharges his whole duty to the consignee when he discharges the goods in conformity with the contract. The libelant's goods were discharged at the proper place, at a suitable time of day, in suitable weather, and placed in proper custody. It was at a season of the year when the weather is uncertain, and all that could reasonably be expected of the master was that he should select a day suitable at the time. Moreover, the other consignees who were present apparently were willing to take the chances of the weather during the coming night. The master had no reason to suppose that the libelant would have objected to taking the same chances if he had

been present. It is not suggested that there was anything that the master or agent of the ship could have done to protect the fruit overnight beyond placing it in the building. Nothing was done to this end by the other consignees. Negligence cannot be imputed to the master for acts done strictly pursuant to previous authority from the libelant. The injury that happened to the fruit was the consequence of a risk which the libelant had agreed in advance to assume. Negligence always rests upon a breach of duty, and there was no breach of duty on the part of the ship if the master discharged the libelant's property at the place and time, and in the manner, to which the libelant could not have reasonably objected had he been present. The libel is dismissed, with costs of this court and of the district court.