Petition of **NEW JERSEY BARGING CORPORATION (DEL.)**, a corporation, for exoneration from or limitation of liability as owner of **THE** Barge **PERTH AMBOY NO. 1.**

United States District Court
S. D. New York.
Oct. 15, 1958.

See also 144 F.Supp. 340.

---

### Report of Commissioner
### To Take Proof on Claims.

To the Honorable Judges of the United States District Court for the Southern District of New York:

By order of this Honorable Court (JOHN M. CASHIN, United States District Judge), made and entered in this proceeding on May 31, 1956, I, Sanford H. Cohen, was appointed Commissioner to take proof concerning: (1) the compliance of all filed claims with the monition, the Admiralty Rules of the Supreme Court of the United States and the rules and practice of this Court, (2) the amount and validity of all filed claims, and (3) the priority, if any, of all filed claims, and upon the completion of such proofs to report thereon with all convenient speed to this Court with the evidence taken before me in respect of the claims and my opinion concerning the stated matters. I duly filed my oath as such Commissioner with the Clerk of this Court on or about September 27, 1956.

I therefore respectfully report that up to and including July 30, 1957, the date of closing of hearings herein, there were presented to and filed in the Court various claims, which claims are listed in Schedule "I" attached to and made a part of this report. The claims in question number 155, and aggregate the sum of $603,612.27, as appears on Schedule "I" referred to. Each and every claimant listed in Schedule "I" received due notice of the commencement of the hearings before the Commissioner.

A number of such claims were expressly withdrawn by the claimants filing same, a schedule of the claims so withdrawn being attached to and made part of this report as Schedule "II".

In addition, a number of claims were abandoned and defaulted upon, default being noted by the Commissioner who in this report recommends dismissal of the claims in question, a list of such claims being attached to and made part of this report as Schedule "III". Prior to the default being noted as last stated, the Commissioner caused to be sent to each of the claimants who had not theretofore appeared, or to his attorney if at one time he had appeared by attorney, a letter advising the particular claimant or his attorney that there had been no appearance on the claimant's behalf pursuant to any of the notices served upon the claimant and that his claim would be heard on a date specified in the letter, at which time he would be required to appear and present his evidence or his default would be entered. Sample forms of letters so sent out are Exhibits 103, 155 and 156.

Attached hereto is a list of the claims remaining to be determined by the Commissioner, such claims being the claims set forth in Schedule "I" after eliminating therefrom the claims set forth in Schedules "II" and "III", a list of the claims so remaining to be determined being set forth in Schedule "IV" attached to and made part of this report, with the recommended damage allowance.

At the outset, the Commissioner is confronted with questions raised by the petitioner as to compliance of filed claims with the monition, with the Admiralty Rules of the Supreme Court and with the rules and practice of this Court.

Question of Compliance of
Filed Claims with the Monition.

The monition required all cited persons claiming damages for any loss, damage, injury or destruction to:

"serve and file with the Clerk of this Court at the United States Court House, Foley Square * * * their respective claims for any and all losses, damages, and/or injuries in writing and under oath, and serve copies thereof on the proctors for the petitioner on or before the 1st day of February, 1955 at 10 o'clock in the forenoon * * *."

This requirement was in conformity with Rule 52 of the Admiralty Rules of the Supreme Court of the United States, 28 U.S.C.A. specifying that:

"Claims shall be filed with the Clerk of the Court in writing under oath and a copy shall be served upon the proctor for the petitioner on or before the return day of the monition."

With respect to certain other claims, a copy of the claim was not filed with the Clerk of the Court on or before February 1, 1955, as the monition required.

With respect to certain other claims, a copy of the claim was not served on the proctors for the petitioners on or before the same February 1, 1955 date prescribed in the monition.

With respect to still other claims, the claim was not verified by the claimant, verification having been either by the proctor for the claimant or having been entirely omitted.

Further in this report, in the examination of the individual claims and the testimony in support thereof, reference is made to the above situations as to each of the claims.

The petitioner contends that the question whether a late claim, or a claim in any way not complying with the moni-

tion, should be allowed despite non-compliance is not one of the matters referred to the Commissioner and that the latter should merely report in each instance whether the claim complied with the monition, leaving it to the Court to determine the legal consequences and effect thereof.

The order of reference states:

"Ordered, Adjudged and Decreed that the matter of the claims herein be and it hereby is referred to Hon. Sanford H. Cohen, Esqs., 16 West 46th Street, New York City, as Commissioner, to take such proof as may be offered concerning (1) the compliance of all filed claims with the monition, the Admiralty Rules of the Supreme Court of the United States and the rules and practice of this Court, (2) the amount and validity of all filed claims and (3) the priority, if any, of all filed claims and upon the completion of said proofs to report thereon with all convenient speed to this Court with the evidence taken before him in respect of the claims and his opinion concerning the stated matters aforesaid;"

■ My powers as Commissioner are, of course, strictly limited and confined by the terms of the order of reference and it would obviously be improper for me to go beyond. Mitchell v. Kelsey, D.C.N.Y., 17 Fed.Cas.No.9,663; Waterman v. Morgan, D.C.N.Y., 29 Fed.Cas. No.17,259.

■ Nevertheless, it is my view that as Commissioner appointed by the Court to report to the Court on the proof, "with the evidence taken before me in respect of the claims and my opinion concerning the stated matters", I should go beyond a mere mechanical transmitting of the claims asserted to be in technical non-compliance with the monition and rules, but rather should give my opinion concerning these matters as the order of reference appears to indicate and require.

■ Fundamentally, it is to be borne in mind, the procedure and practice of admiralty in this country is extremely liberal, the rules governing such practice being even less technical than those in equity. Deupree v. Levinson, 6 Cir., 1950, 186 F.2d 297, certiorari denied 341 U.S. 915, 71 S.Ct. 736, 95 L.Ed. 1351; Rice v. Charles Dreifus Co., 2 Cir., 1938, 96 F.2d 80; Bombace v. American Bauxite Co., 5 Cir., 1930, 39 F.2d 867; The Cleona, D.C.S.D.N.Y.1930, 37 F.2d 599; The Speybank, D.C.D.Md.1928, 28 F.2d 436; Cataldo v. United States, D.C.S.D. N.Y.1952, 108 F.Supp. 560.

In the Deupree case, supra, the Court stated, in language which appears to apply fully to this situation (Allen, C. J., 186 F.2d at page 303):

"It has always been the practice in American admiralty courts to allow the parties every opportunity to place their whole case before the court and to enable the court to administer substantial justice between the parties. It is therefore the long-established rule that omissions and deficiencies in pleadings may be supplied and errors and mistakes in practice in matters of substance as well as of form may be corrected at any stage of the proceedings for the furtherance of justice. 2 Benedict on Admiralty (6th Ed.), 557."

In the Rice case, supra, the Circuit Court in this Circuit stated likewise (96 F.2d at page 83):

"procedure in the admiralty is proverbially plastic".

In the Bombace case, supra, the Court stated with even more clear applicability (Foster, C. J., 39 F.2d at page 869):

"Admiralty permits extreme liberality in pleading and practice, and technicalities are not allowed to interfere with the due administration of justice. The Syracuse, 12 Wall. 167, 20 L.Ed. 382."

In the Cleona case, supra, District Judge Woolsey emphasized the lack of technicality of admiralty procedures and practice, as follows (37 F.2d at page 600):

"fortunately, admiralty practice is plastic. It is largely judge-made,

and consequently not technical—in fact, it is less technical than equity practice."

In the Speybank case, supra, the Court similarly stated (28 F.2d at page 437):

"It is well settled that admiralty proceedings partake of the nature of proceedings in equity, so that the importance which the common law attaches to formalities is, to a large extent, ignored."

In the Cataldo case, supra, the situation was well reviewed and summarized by District Judge Irving R. Kaufman, as follows (108 F.Supp. at page 563):

"The respondent further excepts to the amended libel on the ground that it was not timely served, in that it was served several days beyond the time allowed in an order of Judge McGohey of this Court. The order permitted the amended libel to be served on or before August 29, 1952.

"On August 1, 1952 the libellant served on the proctors for the respondent 'a notice of amendment' to the libel. No objection was made to this 'notice' at the time it was served. When no answer was forthcoming by the early part of September, 1952, proctor for libellant called this to the attention of the proctors for the respondent and was informed that the 'notice' was being disregarded as insufficient and that an amended libel would be necessary. On September 11, 1952, libellant's proctor served and filed an amended libel to which this exception is directed.

"It would be an injustice, indeed, to defeat the libellant's right to a determination on the merits upon a ground so narrow."

\*     \*     \*     \*     \*

"Volume 2, Benedict on Admiralty, page 556 et seq. discusses the policy of the admiralty courts and it is clear from it that it has always been the practice in the American admiralty courts to allow the widest latitude in pleading to the parties,

so that the case may be placed before the court, in toto, on its merits, without permitting mere technicalities to interfere with this right.

"At page 557 Benedict states that it has always been the policy of American admiralty courts 'never to allow a party to overcome his adversary by the mantraps and spring guns of covert chicanery, or by the surprises and technicalities of mere pleading or practice. Therefore, on proper cause shown, omissions and deficiencies in pleadings may be supplied and errors and mistakes in practice, in matters of substance as well as of form, may be corrected at any stage of the proceedings, for the furtherance of justice.'"

When force is ascribed to these clear and often repeated expressions by the Court, it becomes manifest that narrow technicalities such as the petitioner may be here seeking to invoke should not come in the way of the principal task that courts of admiralty are called upon to perform, namely, the doing of substantial justice between the parties.

Benedict on Admiralty (6th ed., vol. 3, Sect. 518) says on the subject specifically of "late claims":

"So long as the limitation proceeding is pending and undetermined, and the rights of the parties are not adversely affected, the court will freely grant permission to file late claims, upon an affidavit reciting the reasons for the failure to file within the time limited. If the commissioner to receive claims has already rendered his report and finished his work, the court may require a supplementary report or may direct the clerk of the court to receive such late claim.

"After the case has reached the point where the efforts of the timely claimants have obtained an offer of settlement, the court will not permit belated claimants to come into the proceedings and reap the benefits of the efforts of those who are timely."

It will be seen from the above that what is involved is the familiar equitable principle based on whether there is or is not prejudice, i. e., whether the party opposing the late filing can properly claim to be "adversely affected".

■ On these hearings, there has been no showing by the petitioner of actual prejudice arising from any of the alleged technical non-compliances sought to be relied upon. Conceivably, if petitioner was in a position to show such actual prejudice, it might still obtain relief before the District Court on motion addressed to that Court citing the facts supporting the claim of actual prejudice. In the absence of such showing of prejudice, however, the Commissioner is disposed to recommend that in all instances where proof on the merits of the claims was adduced and received, the individual claims should be heard and decided on the basis of such proof and not the narrow technicalities sought to be raised.

### Question of Compliance with the Admiralty Rules of the Supreme Court of The United States.

Rule 52 of the Admiralty Rules of the Supreme Court of the United States (previously quoted from in part) provides in further part, as follows:

"Rule 52. Filing and proof of claim in limited liability proceedings * * * Each claim shall specify the various allegations of ·fact upon which the claimant relies in support of his claim, the items thereof, and the dates on which the same accrued."

■ The petitioner likewise contends on this subject that it is for the Commissioner merely to report whether the individual claims complied in the various respects with this Admiralty Rule, leaving it to the appointing Court to determine the legal effect thereof.

■ What has been stated before in the Report with respect to the other preliminary technical points raised applies, the Commissioner feels, with equal and perhaps greater force to this technical objection. Certainly, as to a claimant who adduced proof on the merits in support of his claim, that claim should be heard and decided on the basis of the proof and not any possible technical deficiencies of the written claim filed. Of course, if the petitioner should wish to claim *surprise* based on the failure of any given claim to inform petitioner sufficiently of its scope, that is a matter that could conceivably be remedied by motion addressed to the District Court requesting reopening of the hearing to permit adducing of additional proof not heretofore forthcoming because of the "surprise" feature. It is worth noting, however, that claims of surprise in this context were not made before the Commissioner, or where they were made, appropriate relief was afforded.

### Question of Compliance with Rule 6 of the Admiralty Rules of This Court.

Rule 6 of the Admiralty Rules of the United States District Court for the Southern and Eastern Districts of New York, provides:

"Rule 6—Security for Costs

"(a) No libel, petition, appearance, claim or answer shall be filed, except on the part of the United States, or on the special order of the court, or when otherwise provided by law, or by these rules, unless the party offering the same shall file a stipulation for costs, conditioned that the principal shall pay all costs awarded by the court, and, in case of appeal, by any appellate court, against him, it or them. In suits *in personam,* such stipulation shall be in the sum of $100; in suits *in rem,* or where process of attachment is to be issued, the stipulation shall be in the sum of $250. In lieu of a stipulation the party may deposit the necessary amount in the registry of the court. A separate stipulation for costs shall not be required where a stipulation for value is given and the amount of such stipulation, as fixed by the court or by agreement, is increased by the amount of the appropriate stipulation for costs."

In a number of instances, the claimant failed to comply with Rule 6, as above set forth, by omitting to file a stipulation for costs as therein provided. In some few instances, particular claimants did file stipulations for costs either prior to or subsequent to the date of the monition.

Petitioner apparently urges and contends that all claimants, answering as well as non-answering, must each file a stipulation for costs in the amount of $250 before their respective claims can be heard. This, however, has apparently never been the practice in admiralty. Benedict, supra, has the following to say on the subject (Sect. 513, note 91):

"Damage—claimant who does not answer or contest but merely files his claim for damages with the commissioner pursuant to the monition does not file any stipulation for costs nor make any cash deposit in any district."

Petitioner, after citing British Transport Commission v. United States, 1957, 354 U.S. 129, 77 S.Ct. 1103, 1 L.Ed.2d 1234, states that a claimant "can as a practical matter, put the petitioner to very substantial expense in defending an unfounded or trivial claim."

This statement may be true as to property-claimants in admiralty, but clearly has no application to mere damage-claimants in a limitation proceeding. Benedict, in the work cited, distinguishes the two classes of claimants in admiralty (2 Benedict, op. cit., Sect. 324, at pages 435 and 438; 3 Benedict, ibid. Sect. 480).

It is the Commissioner's opinion that Rule 6 of the Admiralty Rules, in referring to "claims", is intended to embrace only claims of property-claimants, e. g., the claim of the owner of a vessel that has been arrested. It does not appear reasonable on its face that it should embrace also mere damage-claimants who simply file their own claims for damage, seeking allowance therefor at the hands of the admiralty court. In any case, if petitioner should still be disposed to press its position in this regard, it could have ample relief in the form of a motion to strike addressed to the Court, upon the granting of which the Court could afford such equitable relief as by way of permitting a late filing *nunc pro tunc* as it would in its judgment and discretion decide. In this manner, if petitioner were upheld in its contention, it would have its relief in the way of security for costs, while at the same time the damage-claimant would not be denied his day in court on the merits.

Question of What Law Applies.

On the substantive part of the proceedings, the Commissioner is met at the outset with the question of what law governs on the subject of the proper elements and measure of damages. Contention is made by counsel for certain of the claimants that it is the "law of the State of Connecticut, the *lex loci delicti.*" Contention is made by counsel for the petitioner, on the other hand, that what governs and applies is the general maritime law of the United States.

Whatever was the state of the law prior to 1948 (see, e. g. Turner Terminal Co. v. United States, D.C.1950, 93 F.Supp. 441), in the Commissioner's opinion the matter has been laid to rest by the enactment on June 19, 1948, of the Admiralty Extension Act of 1948, Chapter 526 of the Laws of 1948, 62 Stat. 496, 46 U.S.C.A. § 740. That Section provides as follows:

"§ 740. Extension of admiralty and maritime jurisdiction; libel in rem or in personam; exclusive remedy; waiting period

"The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, *caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.*" (Italics mine.)

That Act has been held constitutional in United States v. Matson Nav. Co., 9 Cir., 1953, 201 F.2d 610, and American Bridge Co. v. The Gloria O, D.C.E.D. N.Y.1951, 98 F.Supp. 71.

■ Since the claimed damages and injuries in these proceedings were "caused by a vessel on navigable water", it follows that notwithstanding that such claimed damages were done "or consummated on land", the admiralty and maritime jurisdiction of the United States extends to such situations of claimed injury.

■ The governing law is, therefore, in the Commissioner's opinion, the general maritime law of the United States applicable to maritime torts. It is not the common law of the State of Connecticut.

### Admiralty Law Rules and Principles with Respect to Damages.

■ It is fundamental in admiralty procedure and practice, that the admiralty court is not bound by all the rules of evidence which are followed in the courts of common law and may, where justice requires it, take notice of matters not strictly proved. Clarke S.S. Co. v. Munson S.S. Line, D.C.N.Y., 59 F.2d 423, affirmed, 2 Cir., 1933, 64 F.2d 1011; Pennsylvania R. Co. v. Downer Towing Corp., 2 Cir., 1926, 11 F.2d 466; The Spica, 2 Cir., 1926, 289 F. 436; The Rosalia, 2 Cir., 264 F. 285; Hickman, Williams & Co., Inc., v. Murray Transp. Co., D.C. S.D.N.Y.1940, 31 F.Supp. 820.

In the Clarke case, supra, the Court said (Campbell, D. J., 59 F.2d at page 428):

"The decisions of the New York state courts are not binding, as the Act of Conformity, title 28, § 724, U.S.Code (28 U.S.C.A. § 724), excepts admiralty causes, and in any event this court as an admiralty court is not bound by the strict common-law rules of evidence. The Rosalia, 2 Cir., 264 F. 285, 289."

In the Pennsylvania R. Co. case, supra, the Court likewise said (Hough, D. J., 11 F.2d at page 467):

"The present suit is to recover damages for a maritime tort; libelant is not called on to show performance of any contract, and (as is pointed out in The Spica) admiralty, untrammeled by common-law rules of evidence, pursues its own methods of proof."

In the cited Spica case itself, supra, the Court (Hough, C. J.) had stated (289 F. at page 441):

"We must again insist on admiralty's freedom from the formal and technical trammels of the common-law rules of evidence. The Rosalia, 2 Cir., 264 F. 285, 289. The citations made in that case show that the admiralty has always exercised freedom in respect of evidence, being often satisfied with 'half proof', instead of demanding the 'full proof' of its civil-law origin."

In The Rosalia case, supra, the same Court had previously said (Hough, C. J., 264 F. at page 289):

"But this proceeding is in admiralty, and we 'are not bound by all the rules of evidence which are followed in the courts of common law, and * * * may, where justice requires it, take notice of matters not strictly proved'. The Boskenna Bay (D.C.) 22 F. 662, 667, not changed as to this point by (D.C.) 40 F. 91, 96, 6 L.R.A. 172."

Likewise in the Hickman case, supra, the District Court in this Southern District said (Conger, D. J., 31 F.Supp. at page 822):

"In coming to this conclusion I am taking into consideration the fact that in Courts of Admiralty strict rules of evidence are not always followed, and they may, when justice requires it, take notice of matters not strictly proved and may receive in evidence testimony which might not be admissible in other courts. See Benedict on Admiralty, 5th Ed., section 381, and cases cited therein."

■ These and other authorities additionally make clear, however, that even the extreme liberality of admiralty procedure and practice does not mean that all rules of evidence and common-sense standards of proof should be totally disregarded and what is in effect the com-

plete absence of valid or reasonable proof accepted as proof or in lieu thereof. Fairness still requires that a party having the burden be held to some fair standard of establishing the validity and amount of his claim. Kemsley, Millbourn & Co. v. United States, 2 Cir., 1927, 19 F.2d 441; The Boskenna Bay, D.C.S.D.N.Y.1884, 22 F. 662.

In the Kemsley case, supra, the Court of Appeals in this Second Circuit said (per curiam, 19 F.2d at page 442):

"Our ruling in The Spica, 289 F. 436, 437, is not to be taken as throwing all rules of evidence to the winds. * * * It is not to be supposed that evidence of every sort is competent in the admiralty. While the rules are not so strict as elsewhere, we do not expose litigants to proof whose verity is not vouched for by some reasonable assurance. Assuming that the ship's agents supposed the goods to have been transshipped in fact, the libelant had no means of ascertaining the ·sources of their belief, of checking its reliability by cross-examination, of testing it by an inquiry into how the ship's business was done, and how its records were kept. Even if these defects in the proof are not absolute, the respondent had over two and a half years to procure better evidence, and does not suggest that it was not available. The hazard of such proof is an insurmountable objection to its receipt."

Likewise, in the very Spica case itself, the Court had qualified its own statement of extreme liberality, saying (Hough, C. J., 289 F. at page 441):

"Nevertheless, in a day and country where the same counsel and judges administer law, equity, and admiralty, it is most desirable that even the historic freedom of admiralty should pursue that system of fact finding which is deemed by leaders in legal thought best suited to current conditions of human activity."

In the earlier Boskenna Bay case, supra, the District Court in this District had similarly stated (Brown, J., 22 F. at page 667):

"Such a practice (i. e., of great liberality) if permitted within these limits in the interests of justice, should not, however, be extended so as to encourage laches in preparations for trial, or so as to excuse the neglect to procure available proof where the need of it could have been foreseen."

It is within these narrow poles of application that the true governing principles of evidence and damage proof in this case are to be found.

Counsel for the petitioner in his memorandum (pages 8–11) sums up his contentions as to the applicable law of damages in this proceeding, as follows:

"The substantive rules concerning damages however do not differ in Admiralty Courts from Common Law Courts (there are certain exceptions, of course, in collision cases, etc., which are without relevance in the present proceeding). As a general proposition, damages in Admiralty are awarded to make an injured person whole but one guilty of tort is only responsible for the immediate, natural and probable result of his conduct. Remote damages are not recoverable in Admiralty any more than they are at law. Intervening causes prevent the award of damages against a wrongdoer in Admiralty just as they do at law."

"Perhaps the largest problem in this case is the measure of quantum of damage. It is the most substantial problem only because a proper disposition of it disposes of practically all of the claims filed as being worthless. With the exception of the erosion claims, they involve, at best, some temporary injury to real estate. This the Commissioner knows by personal observation as well as by a consideration of the evidence offered. The question is what measure of damage should be applied to a *temporary* rather than a permanent injury to real estate.

"It is well recognized in all courts that where there has been permanent damage to real estate the measure of recovery is the diminution in market value but obviously such diminution cannot be a measure of recovery where the damage is *temporary*. In the case of *temporary* injury the measure of damages is the loss of use and enjoyment of the property. The next question is how to prove the *value* of such loss of use. The standard must be an objective one. The loss cannot be measured by some subjective, personal use varying from individual to individual. Accordingly, loss of use and enjoyment is measured by an *objective* standard, namely, depreciation of rental value attributable to the damage. Of course, such damages cannot exceed the cost of restoring the land to its former condition.

"With the exception of a very few claims, no attempt was made by the damage claimants to present evidence to show any depreciation of rental value attributable to the oil spillage. Conjecture cannot supply lack of evidence and therefore the Commissioner should report that in all claims (with the exceptions hereinafter noted) no proof was offered at all concerning the depreciation of rental value, if any, attributable to the spillage and the amount of each of such claims is nil."

The Commissioner agrees with the counsel in the contention of petitioner's above-quoted statement that in Admiralty the general rules of damages are applicable. It is the Commissioner's view, however, that petitioner's contentions as quoted from above result in too narrow and limited rule of damages applicable to this proceeding. Specifically, petitioner's contentions fail to take into account and allow for compensation to particular claimants based on the element of annoyance, inconvenience and discomfort such as the authorities appear to permit and sustain, viz.:

Baltimore & Potomac R. Co. v. Fifth Baptist Church, 1883, 108 U.S. 317, 2 S.Ct. 719, 726, 27 L.Ed. 739, was a suit by the Church to recover for the nuisance caused by the Railroad erecting an engine house and machine shop on a parcel of land immediately adjoining the church premises and using the properties erected in such a way as to disturb the congregation assembled in the church, interfere with the religious exercises carried on, and otherwise destroy the value of the building as a place of public worship. The suit was brought in the District of Columbia where the church was situated to recover for the damages sustained. The Court upheld the recovery below, stating on the question of damages (Field, J.):

"If the facts are established which the evidence tended to prove, and from the verdict of the jury we must so infer, there can be no doubt of the right of the plaintiff to recover. The engine-house and repair-shop of the railroad company, as they were used, rendered it impossible for the plaintiff to occupy its building with any comfort as a place of public worship. The hammering in the shop, the rumbling of the engines passing in and out of the engine-house, the blowing off of steam, the ringing of bells, the sounding of whistles, and the smoke from the chimneys, with its cinders, dust, and offensive odors, created a constant disturbance of the religious exercises of the church. The noise was often so great that the voice of the pastor while preaching could not be heard. The chimneys of the engine-house being lower than the windows of the church, smoke and cinders sometimes entered the latter in such quantities as to cover the seats of the church with soot and soil the garments of the worshipers. Disagreeable odors, added to the noise, smoke, and cinders, rendered the place not only uncomfortable, but almost unendurable as a place of worship. As a consequence, the congregation de-

creased in numbers, and the Sunday-school was less numerously attended than previously.

"Plainly the engine-house and repair-shop, as they were used by the railroad company, were a nuisance in every sense of the term. They interfered with the enjoyment of property which was acquired by the plaintiff long before they were built, and was held as a place for religious exercises, for prayer and worship; and they disturbed and annoyed the congregation and Sunday-school which assembled there on the Sabbath and on different evenings of the week. That it is a nuisance which annoys and disturbs one in the possession of his property, rendering its ordinary use or occupation physically uncomfortable to him. *For such annoyance and discomfort the courts of law will afford redress by giving damages against the wrongdoer,*

\* \* \* \* \* \*

"The instruction of the court as to the estimate of damages was correct. *Mere depreciation of the property was not the only element for consideration.* That might, indeed, be entirely disregarded. *The plaintiff was entitled to recover because of the inconvenience and discomfort caused to the congregation assembled, thus necessarily tending to destroy the use of the building for the purposes for which it was erected and dedicated.* The property might not be depreciated in its salable or market value, if the building had been entirely closed for those purposes by the noise, smoke, and the odors of the defendant's shops. It might then, perhaps, have brought in the market as great a price to be used for some other purpose. *But, as the court below very properly said to the jury, the congregation had the same right to the comfortable enjoyment of its house for church purposes that a private gentleman has to the comfortable enjoyment of his own house,*

*and it is the discomfort and annoyance in its use for those purposes which is the primary consideration in allowing damages. As with a blow on the face, there may be no arithmetical rule for the estimate of damages. There is, however, an injury, the extent of which the jury may measure."* (Emphasis mine.)

A similar rule was applied in a subsequent case between the same parties, namely, Baltimore & Pennsylvania Railroad Co. v. Fifth Baptist Church, 1891, 137 U.S. 568, 11 S.Ct. 185, 34 L.Ed. 784.

In United States Smelting Co. v. Sisam, 8 Cir., 1911, 191 F. 293, 37 L.R.A., N.S., 976, recovery was permitted of damages sustained by the plaintiff, Sisam, as a result of injury caused to plaintiff's growing crops of vegetables and fruits by sulphurous fumes emitted from the defendant company's smelter. The Court permitted recovery, citing the Baltimore & Potomac R. R. case, and stating (Sanborn, C. J., 191 F. at page 302):

*"If a corporation may recover damages because the discomforts of individuals seeking to worship in its building tend to destroy the use of its church for the purposes for which it was erected, may not a householder recover damages because the discomforts of his wife and the other members of his family caused by a nuisance tend to destroy the use of his home and farm for the purposes for which he obtained and maintains it?* The following authorities sustain the court below in its affirmative answer to that question: Pierce v. Wagner, 29 Minn. 355, 13 N.W. 170; Friburk v. Standard Oil Co., 66 Minn. 277, 68 N.W. 1090; Mills v. Hall & Richards, 9 Wend., (N.Y.) 315, 316, 24 Am.Dec. 160; Kearney v. Farrell, 28 Conn. 317, 73 Am.Dec. 677; Missouri, K. & T. Ry. Co. of Texas v. Anderson, 36 Tex.Civ.App. 121, 81 S.W. 781, 788; Story v. Hammond, 4 Ohio 376; Ellis v. Kansas C., St. J. & C. B. R. Co., 63 Mo. 131, 134, 21 Am.Rep. 436. *And the conclusion is that the owner of a residence which*

is rendered inconvenient, uncomfortable, and unhealthy as a home by the nuisance of sulphurous fumes and their products thrown upon it by another may prove and recover in an action therefor the damages he suffers himself from the discomfort and sickness thereby inflicted * * *". (Emphasis mine.)

In City of Harrisonville, Mo. v. W. S. Dickey Clay Mfg. Co., 8 Cir., 1932, 61 F.2d 210, certiorari granted 288 U.S. 594, 53 S.Ct. 319, 77 L.Ed. 972, reversed on other grounds 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208, suit was brought by the plaintiff against the City of Harrisonville to recover damages caused by pollution of a stream as a result of the City discharging sewage therein. The Court, permitting recovery stated (Cant, D. J., 61 F.2d at pages 212 to 213):

> "The nuisance here in question, being such as might be abated by order of court, is temporary in character, * * *
>
> "In all cases of nuisance, as well as of other torts, and aside from the right to punitive damages in certain cases, the person sustaining the injury is entitled to recover such sum as will fairly compensate him for all detriment of every kind which he has suffered and which is traceable proximately to the wrong of which he complains. This detriment or injury may often be of various kinds. He is entitled to be made whole. He is not entitled to any excess or profit. In this respect, whatever is right and just should be done.
>
> "In cases of permanent nuisance affecting real estate, the measure of damages usually is the difference between the value of the land which is involved immediately before the imposition of the nuisance and the value of the same land immediately after such imposition, having in mind that the conditions are to remain permanent. (Citing cases).
>
> * * * * *
>
> "In cases of temporary nuisance affecting real estate, the rule ordinarily applicable is that the plaintiff is entitled to recover the difference between the rental or usable value of the land as it would be without being subjected to the nuisance, and such value with the lands subject thereto.
>
> * * * * * *
>
> "In some cases of nuisance, both temporary and permanent, certain special features such as the injurious effect of the nuisance upon the health of the plaintiff, or of his family, or the fact that the nuisance may have injured the health, or caused the death of domestic animals, and also other injuries peculiar to the specific case, must sometimes be considered. As already stated, whatever the character of the injury, if the same be traced to the nuisance as the proximate cause, plaintiff is entitled to compensation on account thereof." (Emphasis mine.)

Storley v. Armour & Co., 8 Cir., 1939, 107 F.2d 499, was a suit by a farmer in North Dakota to recover against the Armour packing company for damage arising from pollution of the river with effluent from the packing company's plant. Recovery based upon the depreciation in value of the cattle was denied, the Court stating that the evidence was insufficient to justify a recovery as to this item of alleged damage because there was no proof of the fair market value of the cattle which were injured by the pollution of the water, either prior to or subsequent to the time of the injury. However, recovery was permitted based on the plaintiff's claims for washing milk cows, the Court stating (at page 509):

> "The court below made an allowance to some of the plaintiffs for washing milk cows, at the rate of fifteen cents per hour. They had asked for sixty to seventy cents per hour. The contention is that the undisputed evidence was that the time spent in washing cows was worth the higher figure. There was testimony by one of the plaintiffs that 'a reasonable wage paid a com-

mon laborer on this basis would be sixty to sixty-five cents an hour.' Another plaintiff tèstified: 'People say laborers are getting sixty to seventy cents an hour. I don't hire anybody. I have a brother-in-law working in town getting sixty or seventy cents an hour.' There was also evidence that one of the plaintiffs had hired his son to operate his farm at a monthly wage of $25 plus board and room. There was no evidence that any of the plaintiffs actually hired anyone to wash cows or paid out any money on that account, nor was there evidence that some washing of cows might not have been necessary if there had been no unlawful pollution of the river. The defendant introduced evidence tending to show that farmers occupying farms on the river above the plant washed milk cows after they had been standing in the river. *What constituted, under the circumstances, a reasonable allowance for such washing of cows as was due to the unlawful pollution of the river by the defendant was, under the evidence, a question of fact for the trial court,"* (Emphasis mine.)

The plaintiff complained to the appeals court based on the allowance of only $150 per year predicated upon the discomfort, annoyance, inconvenience, etc. suffered. The appellate court upheld the court below on this item, stating (at page 509):

"It is contended that the court's allowance of $150 per year to each of the plaintiffs *who occupied their farms, on account of interference with comfortable living due to the pollution of the river,* was grossly inadequate and not sustained by any evidence. It would be impossible to ascertain with any degree of accuracy what amount of money would constitute reasonable compensation for the discomfort caused by the foul odors emanating from the river or from the presence of an abnormal number of flies. *The responsibility*

*and discretion for determining fair compensation, under the circumstances, was that of the trial court.* See Olson v. Armour & Co., 68 N.D. 272, 280 N.W. 200, 203. *We cannot say that as a matter of law the evidence compelled a greater allowance for this item."* (Emphasis mine.)

The same situation obtained with respect to the allowance made by the District Court for the deprivation of swimming, boating and fishing privileges which the plaintiff claimed was grossly inadequate, the Court stating (at page 510):

"The allowance by the court of $25 annually *for the deprivation of swimming, boating and fishing privileges, which it is contended was grossly inadequate, stands in the same situation.* The river below the plant is approximately 15 feet wide and 1½ feet deep. Its banks are muddy. There is testimony that the bottom was firm and hard prior to the existence of the nuisance. The deprivation of these privileges did not result in any actual loss of money. *What would constitute reasonable compensation for the loss of these privileges was essentially a question for the trier of the facts."* (Emphasis mine.)

In the light of the above authorities, it would seem to the Commissioner that he is authorized, and in fact required, to make award of compensation for such annoyance, inconvenience and discomfort suffered by particular claimants to the extent of and in an amount commensurate with the annoyance and discomfort proven.

As indicated by the cases above-cited, it is incumbent upon the Commissioner, as would be the case with a court or jury, to arrive at a fair and reasonable award, taking into consideration his observation of the witnesses, the manner in which they testified and his conclusion as to the weight and force to be attributed to the latter's testimony and disregarding exaggerations apparent to the Commissioner.

Counsel for a large group of claimants proposed a so-called "formula" method in aid of assessing damages for loss of use of the beach and shore, such method yielding a figure for loss of use of littoral or riparian rights—i. e., swimming, sun-bathing, fishing, boating, picnicking, etc.—of $8.00 per front foot of shore front for houses used as summer cottages only, and $12 per front foot for all-year-round homes. These figures, counsel in question attempted to justify, as follows:

One, Milton M. Hannan, a real estate expert, called on behalf of one of the claimants only, had testified that undeveloped shore front property in Milford had a value prior to the oil spill of $80 to $100 per front foot (s. m. p. 2727). This was for vacant building lots in the area from Woodmont on the north to the extreme southerly part of Milford. One, Philip C. Riley, a real estate broker and expert, likewise called on behalf of one of the claimants, testified that he had recently received a cash offer of $15,000 for his unimproved lot at Point Lookout in Milford with a shore frontage of 125 feet (s. m. p. 1277), i. e., at the rate of $120 per front foot. One, Theodore A. Heller, also a real estate expert, called merely on behalf of one of the claimants, testified that the normal value of the shore front property in the Morris Cove Section of New Haven prior to the oil spill was $80 to $100 per front foot of shore front (s. m. p. 437). Mr. Heller gave this value for improved property. All the claims considered herein are comprised within these two areas.

Counsel went on to argue that on the assumption that an evaluation of $100 per front foot were taken, a value which he stated would be extremely conservative, a conservative rental value would hence be $12 per front foot per year, "having in mind taxes and maintenance costs."

Counsel then pointed to testimony that for rental premises, approximately two-thirds of the gross annual rent came from summer residents during the approximately ten weeks from June 15th to Labor Day, and one-third from the remaining approximately eight months after allowing time for necessary reconditioning before and after the summer season.

Applying such two-thirds ratio, counsel proposed this formula for assessing damages for loss of littoral or riparian rights for year-end houses:

| | |
|---|---|
| Last quarter of 1954 | $3 per front foot |
| Full year 1955 | $12 " " " |
| Full year 1956 | $6 " " " |
| 1957 and subsequent years | $4 " " " |

For summer cottages, and omitting the summer season of 1954 which preceded the oil spill, counsel proposed this formula:

| | |
|---|---|
| 1955 season | $8 per front foot |
| 1956 season | $4 " " " |
| 1957 and subsequent years | $3 " " " |

Counsel stated that the foregoing was predicated on the testimony of many of the witnesses that their littoral and riparian rights could not be enjoyed at all during 1955, that by 1956 a considerable improvement, estimated in some cases to be about 50%, had taken place, but that there was still oil on the premises which would cause residential damage for an uncertain period in the future until the

forces of nature could fully eradicate the oil. The testimony of one, David W. Comstock, at pages 2447 et seq. was pointed to in this connection.

Counsel concluded by stating:

"It is submitted that the foregoing formulae for year-round homes and for summer cottages should be adopted by the Commissioner as furnishing a convenient, fair and equitable measure of damages for loss of use of littoral or riparian rights."

The difficulty with such an approach is that however ingeniously it may have been devised and assembled by counsel, it has no basis in legally accepted or acceptable standards of proof of damages. It heaps assumption upon assumption without testimony to support essential links in the chain of argument made. For example, it cannot be supposed or concluded that during the 1955 period a year-round house which suffered from the oil spill had no rental value whatever. Yet this, precisely, is the sum and purport of putting the damage for this year *at the full $12 per front foot*. The same applies to the summer season rental where the damage for 1955 is put *at the full $8 per front foot*. The same is likewise true of the 1956 year where counsel assumes a 50% loss of use, obviously confusing a supposed 50% loss of beach use with an equivalent 50% loss of rental use of the entire property. A look at Exhibit 116, relating to one particular claimant's property, with its mass of stones for beach, shows that a 50% loss of use of the beach itself could never conceivably account for a 50% loss of rental use of the entire property.

The difficulty is not cured, moreover, if in place of the percentages of loss of use or rental value that counsel proposes, the Commissioner were to be asked to select and employ his own percentages for loss of use or rental value. In either case, the result based on a so-called "formula" method would suffer from the same deficiency of lack of proper basis of proof in the record. The Commissioner cannot, any more than can counsel or the individual claimant, estimate the loss of rental value to various premises arising from the oil spill, in the absence of proper proof in the record to show such amount of loss of rental value.

In the light of all the foregoing, the Commissioner feels constrained to reject as without proper basis in law or in fact in this record, the so-called "formula" method that the counsel in question proposes on behalf of the claimants represented by him.

[Pages containing detailed considerations of each claim filed, which are not of general interest, are omitted.]

▪ As is apparent, throughout the hearings on the claims, the Commissioner was confronted with situations of claimed damage which did not permit of definite ascertainment "by calculation". However, this, of course, did not of itself present insuperable barrier to the arriving at by the Commissioner of recommended allowances based on the testimony and exhibits in evidence before him (see, Augustus N. Hand, C. J., in Briscoe v. United States, 2 Cir., 65 F.2d 404, 406).

Motions were made at various times and by various proctors representing parties in the course of these hearings and in connection with particular claims. Such motions, where not specifically ruled upon heretofore in this Report, are disposed of in a manner consistent with this Report. That is, where such motions went to the essence of the claim, as for instance motions to strike entire claims, and the Commissioner has recommended allowance herein, the Commissioner has denied such motions. All motions to conform claims to proof are granted.

The Commissioner submits to the Court with his Report the following:

1. The Minutes of Testimony taken at the hearings held before him, consisting of 3,618 pages.

2. The Exhibits received in evidence, numbering 181.

3. The Briefs, Memoranda and other like submissions received by the Com-

missioner from various proctors and claimants.

4. The notice to proctors and claimants of the filing of the Report.

5. A schedule of disbursements expended and incurred, together with the requested allowance to the Commissioner.

Gay & Behrens, New York City, for petitioner, Edward J. Behrens, James A. Hageman, New York City, of counsel.

Fennelly, Eagan, Nager & Lage, New York City, for damage-claimants Bay View Improvement Ass'n and others, William P. Lage, New York City, of counsel.

Dow & Stonebridge, New York City, for claimant Roger Williams, Jr.

CASHIN, District Judge.

This is a motion for an order confirming the Commissioner's report in a limitation of liability proceeding, fixing the amount of the Commissioner's fee and expenses, and directing the entry of a final decree. Also considered are exceptions filed and heard as to the Commissioner's report.

The exceptions of Roger Williams, Jr., as assignee of George A. Clement, have been withdrawn by stipulation, and award in the amount of $350 is approved.

Similarly, the claim of Byrolly, Inc., originally denied, is, by stipulation, allowed in the amount of $300.

The petitioner's exceptions are overruled. If the reference be deemed one of both fact and law the Commissioner's report is confirmed in its entirety. If the reference be deemed one of fact only, the report, insofar as it contains findings of fact, is confirmed, and insofar as it contains conclusions of law, the conclusions of the Commissioner are adopted as those of the Court. Admiralty Rule 43½, 28 U.S.C.A.

The compensation of the Commissioner and his disbursements are approved as submitted.

A final decree shall be settled in accordance with this order. In accordance with an oral stipulation entered into among the proctors for the petitioners and the proctors for all claimants appearing at the argument of this motion, settlement shall be on ten days' notice, the notice thereof being served by mail on proctors for the claimants or on the claimants themselves who have appeared pro se, at the addresses of the proctors or the claimants appearing in the files of this proceeding.

It is so ordered.